IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CASSANDRA PATTERSON; and FRANK BEAMON,

    Plaintiffs,

v.

CITY OF CLARKSVILLE; and LYSSED PACHECO, in her individual and official capacities,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

NO. 3:23-CV-00682

JUDGE RICHARDSON

## <u>MEMORANDUM OPINION</u>

Pending before the Court is a motion to dismiss filed Defendants, City of Clarksville and Officer Lyssed Pacheco (Doc. No. 20, "Motion"), wherein Defendants seek to dismiss the amended complaint (Doc. No. 17, "Amended Complaint") filed by Plaintiffs Cassandra Patterson ("Patterson") and Frank Beamon ("Beamon") (collectively "Plaintiffs").

In support of the Motion, Defendants filed a memorandum of law (Doc. No. 21, "Memorandum"), arguing *inter alia* that Plaintiffs have failed to state a valid claim under 42 U.S.C. § 1983 against Defendants. Plaintiffs filed a response in opposition (Doc. No. 23, "Response"). Defendant filed a reply[1] (Doc. No. 24-1, "Reply").

For the reasons stated herein, Defendants' Motion will be **GRANTED IN PART AND DENIED IN PART**.

---

[1] Defendants filed the reply as an attachment to a motion (Doc. No. 24) to file a reply in support of the Motion with excess pages. The Court granted that motion (Doc. No. 25).

Patterson and Beamon are of African American descent and have been in a romantic relationship with each other since before the search and arrest at issue here. (Doc. No. 17 at ¶¶ 3, 4, 12). Defendant City of Clarksville (the "City") is a municipality in Tennessee that, during all relevant times of the incident, employed Defendant Officer Lyssed Pacheco ("Officer Pacheco") as a member of the City's police department. (*Id.* at ¶¶ 5-6).

On July 11, 2022, at approximately 2 a.m., Plaintiffs were sitting in Beamon's 2017 Nissan Rogue ("Beamon's car" or "his car") outside Beamon's apartment in Clarksville. (Doc. No. 17 at ¶¶ 11, 13). As they talked, Plaintiffs noticed multiple police vehicles driving up and down on the road. (*Id.* at ¶ 13). At around 3 a.m., three officers, including Officer Pacheco, approached Beamon's car and knocked on the window. (*Id.* at ¶ 13). The officers, including Pacheco, asked why Plaintiffs were sitting in Beamon's car at that hour and asked to see identification. (*Id.* at ¶ 14). Plaintiffs asked the officers why they had approached Beamon's car, and "the officers and/or [Officer] Pacheco" responded that "'kids were breaking into cars'" in the area. (*Id.* at ¶ 15) (quoting the officer(s)).

---

[2] The facts contained herein come from Plaintiffs' "First Amended Complaint for Damages" (Doc. No. 17, "Amended Complaint"). For purposes of the instant Motion and pursuant to the typical mechanisms of assessing motions under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the facts in the Amended Complaint as true, except to the extent that this Order qualifies them (as, for example, by "Plaintiffs allege") to denote that they are not being taken as true (because, for example, they are not really facts at all but rather legal conclusions) but rather are set forth to indicate what Plaintiffs *claim* to be true. Throughout this Order, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even with the awareness that any such alleged fact may ultimately prove false.

The Court also notes here that Defendants neglected to put forth their own version of pertinent alleged facts. It does not help a 12(b)(6) movant, who claims that the alleged facts do not plausibly suggest an entitlement to relief, to forgo a discussion about what the pertinent alleged facts actually are. In other words, it can very much help a 12(b)(6) movant to set up the pertinent material facts before knocking them down (in terms of their efficacy in stating a claim).

Beamon was then removed from his car and "searched against his wishes."[3] (*Id.* at ¶ 16). Officer Pacheco asked Beamon whether she could search his car; Beamon responded in the negative, but she searched proceeded to search Beamon's car anyway. (*Id.*). Patterson asked what Plaintiffs had done to initiate this interaction by the officers and Defendant Pacheco, and she (Patterson) was informed they could not tell her. (*Id.* at ¶ 17). Patterson was then asked to step out of Beamon's car; also, Officer Pacheco asked Patterson if she could search Patterson's person, and Patterson said no. (*Id.* at ¶ 18). Officer Pacheco told Patterson that she was going to search her anyway, and she proceeded to do what Plaintiffs describe as "horrifically violat[ing]" Patterson. (*Id.* at ¶ 19).[4] Officer Pacheco groped Patterson's breast and nipples and then went "up under [ ] Patterson's dress and insert[ed] her fingers into Ms. Patterson's vagina." (*Id.* at ¶¶ 20-21). Patterson continued to object to this search and informed Officer Pacheco that she was not hiding anything in her breasts or vagina. (*Id.* at ¶ 22). Officer Pacheco's search "was not productive" (meaning, the Court infers, did not result in anything being found). (*Id.*). After the search, Officer

---

[3] The Amended Complaint says nothing about the manner in which, or by whom, Beamon was removed from his car and searched.

[4] The Court accepts as true Plaintiffs' allegations regarding what actions Officer Pacheco took vis-à-vis Patterson. However, the Court does not accept as true the conclusory and subjective statement that what Officer Pacheco did amounts to "horrifically violat[ing]" Patterson; the statement is not actually an allegation of fact regarding the events at issue, but rather a verbal characterization of the upshot of the alleged events. That is not to say that it matters whether the Court accepts this characterization as valid.

Likewise, the Court does not accept as true Plaintiffs' characterization that there were "two . . . violations" of Patterson. This is because this characterization is not actually a factual allegation of the events but rather a subjective description of the events in question as constituting two different "violations" rather than a single "violation," and because Plaintiffs do not say why it is appropriate to say that there were two violations rather than a single violation. The Court is not even sure how Plaintiffs are dividing up the violation(s); perhaps one violation is the groping and one violation is the digital insertion, but Plaintiffs do not indicate. None of this is to say that it matters whether the Court accepts this characterization as valid. For their part, Plaintiffs do not say whether (and, if so, why) it matters if there were multiple violations rather than a single violation.

Pacheco handcuffed Patterson but stated that Patterson was only being detained, as opposed to arrested. (*Id.* at ¶ 23).

The search of Beamon's car yielded a small amount of marijuana "that was for personal use," although neither of the Plaintiffs was intoxicated or had engaged in any marijuana use "that evening."[5] (*Id.* at ¶ 24). Officer Pacheco arrested Beamon and led him to the back of the patrol car. (*Id.* at ¶ 25). Officer Pacheco then searched Patterson, still handcuffed, for a second time "against her will". (*Id.* at ¶ 26). Officer Pacheco once again groped Patterson and stuck her fingers inside Patterson for a second time. (*Id.* at ¶ 27). Patterson again protested and informed Officer Pacheco that there was nothing being concealed inside her vagina. (*Id.* at ¶ 28). Patterson was neither arrested nor charged with any crime. (*Id.* at ¶ 29). At no time did Patterson agree to any search and at no time did she sign any waiver for a body-cavity search. (*Id.* at ¶ 30).

The officers charged Beamon with simple possession (of marijuana, the Court infers). (*Id.* at ¶ 29). In her official citation of Beamon, Officer Pacheco stated in pertinent part:

> [She, Officer Pacheco] made contact with Beamon while he was in vehicle. While speaking with Beamon an odor of marijuana could be detected. Beamon confirmed the odor was marijuana. During PC search marijuana and scales were located.

(*Id.* at ¶ 31).

---

[5] The reference here to "that evening" is puzzling and inapt; the event at issue began at approximately 3:00 a.m., many hours removed from any period of the day that could reasonably be called "evening."

Plaintiffs also here allege that "[t]here could not have been an odor of marijuana coming from Mr. Beamon." (Doc. No. 17 at ¶ 32). The Court declines to accept this allegation as true. First, this strikes the Court less as a factual allegation and more either as speculation or an opinion (as to which expert testimony possibly could be required) as to what is possibly concerning the emanation of the odor of marijuana under particular applicable circumstances. Second, the allegation seems to be based exclusively on Plaintiffs' factual allegation that neither of the Plaintiffs had engaged in any marijuana use "that evening—an allegation that fails to come close to adequately supporting the speculation.

Beamon entered into a "'best interest' plea deal via diversion." (*Id.* at ¶ 66). Plaintiffs assert (via a legal conclusion, which, like any legal conclusion, the Court does not accept as true) that pursuant to Tennessee Code Annotated § 40-35-313, Tennessee's judicial diversion statute, "Beamon's plea will result, at the end of the deferred judgment period, in a dismissal of his person and a discharge of the proceedings and will not stand on his record as a conviction." (*Id.* at ¶ 67). Via another legal conclusion, Plaintiffs assert additionally that "his deferred judgment adjudication does not bar his claim against the unlawful search and seizure discussed herein." (*Id.* at ¶ 68). Plaintiffs also assert the legal conclusion(s) that they "were racially profiled, harassed, and/or physically violated for lawfully sitting in Mr. Beamon's car outside of his home, as a result of the Defendant (s) [sic] racial animus/discrimination and improper motives."[6] (*Id.* at ¶ 33).

## PLAINTIFFS' CLAIMS

The Amended Complaint contains five (5) counts. Three of these assert claims under Section 1983: unreasonable search and seizure against the City and Officer Pacheco, in both her official and individual capacities, (Count 1); false arrest/false imprisonment against the City and Officer Pacheco, in both her official and individual capacities, (Count 2); and failure to train, supervise or discipline against the City only (Count 5). The other two claims are state-law claims: intentional infliction of emotional distress ("IIED") against Officer Pacheco only (Count 3); and civil battery against the City and Officer Pacheco, in both her official and individual capacities, (Count 4). (*Id.* at ¶¶ 48-96). Count 4 is brought solely by Patterson, and all other counts are brought by both Plaintiffs. Due to the various permutation of claims occasioned by the fact that there are

---

[6] Notably, despite here alleging that they were "racially profiled," Plaintiffs do not make any claims based on that allegation, such as, for example, an equal-protection claim.

two Plaintiffs and two Defendants, the five counts actually assert a total of (14) claims, insofar as a claim is defined terms of a particular plaintiff seeking recovery against a particular defendant.

<u>LEGAL STANDARD</u>

The Court must take all factual allegations in the Amended Complaint as true when reviewing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[7] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint that survives a motion to dismiss under Rule 12(b)(6) must contain sufficient allegations of factual matter, that when accepted as true, state a facially plausible claim. *Id.* Facially plausible claims are those that have sufficient factual content such that a court may draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *Id.*

On the other hand, well-pled factual allegations allow the court to assume their veracity and then determine whether they plausibly give rise to an entitlement of relief. *Id.* at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, and mere recitations of the elements of a cause of action are insufficient. *Id.*; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (cited in *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018)). Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the plaintiff's burden, as mere consistency does not establish the plausibility of entitlement to relief even if it supports the possibility of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be

---

[7] The Court has done exactly that when discussing the material factual allegations in the Amended Complaint, as indicated above.

appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief, including any "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. Then, the question is whether the remaining allegations plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

In general, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is central to plaintiff's claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-653 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-792 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir. 2008). To put it only slightly differently, "[a] Rule 12(b)(6) movant 'has the burden to show that the plaintiff failed to state a claim for relief.'" *Willman v. Att'y Gen. of United States*, 972 F.3d 819, 822 (6th Cir. 2020) (quoting *Coley v. Lucas Cnty.*, 799 F.3d 530, 537 (6th Cir. 2015)). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved in a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it bears

the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

As an initial matter, it is evident to the Court that all claims[8] against Officer Pacheco in her official capacity must be dismissed. When an employee of an entity is sued in the employee's official capacity, the court treats the official-capacity claim as a claim against the employer-entity. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally represent . . . another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). And "[c]ourts within the Sixth Circuit consistently dismiss official-capacity claims against municipal officials that are duplicative of claims asserted by the plaintiff against the municipal entity itself." *Rodgers v. Cnty. of Oakland*, No. 18-CV-12832, 2019 WL 3777031, at *4 (E.D. Mich. Aug. 12, 2019). Thus, finding this sort of duplicative claim to be "redundant," just as Defendants claim, (Doc. No. 21 at 20-21), the Court hereby dismisses all claims (in Counts 1, 2, and 4) against Officer Pacheco in her official capacity.

Accordingly, the remaining pending claims for this Court are as follows: (a) Plaintiffs' Section 1983 claims for unreasonable search and seizure against the City and Officer Pacheco in her individual capacity only (Count 1), false arrest/false imprisonment against the City and Officer Pacheco in her individual capacity only (Count 2), and failure to train, supervise or discipline claim against the City only (Count 5); and (b) the state-law claims for IIED against Officer Pacheco only (Count 3) and civil battery against the City and Officer Pacheco, both in her official and individual capacities (Count 4).

---

[8] This appears to be in relation only to Counts 1, 2, and 4.

<u>DISCUSSION</u>

**A.** **Beamon's and Patterson's Section 1983 Claims Against the City (Counts 1, 2, and 5)**

As far as the Amended Complaint indicates, the alleged basis for the City's liability on Counts 1 and 2 is *solely* vicarious liability, i.e., liability based solely on the relationship between the City and the person allegedly committing the constitutional violations alleged in Counts 1 and 2. That is, the Amended Complaint posits that the City is liable on these two counts "through the actions of its agent, Officer Pacheco." (Doc. No. 17 at 8, 9). The clear suggestion is that the City is liable on these Counts solely because the constitutional violations alleged in these two counts (which were also brought against Officer Pacheco) were committed by the City's "agent," Officer Pacheco, and nothing in the Amended Complaint indicates otherwise.

Counts 1 and 2 are easily disposed of. As counsel for Plaintiffs absolutely should have known before bringing these claims and causing the Court to expend judicial resources on them, a "city is not vicariously liable under § 1983 for the constitutional torts of its agents: [i]t is liable only when it can be fairly said that the city itself is the wrongdoer."[9] *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122 (1992). Another way to put this is that a city cannot be held vicariously liable under § 1983 for the actions of its agents or employees under the doctrine of *respondeat superior*. *See id.* (explaining that *"*unlike[in]  ordinary tort litigation, the doctrine of *respondeat superior* [i]s inapplicable" to § 1983 claims). So Counts 1 and 2 plainly never should have been brought against the City in the first place and, thus, are easily dismissed out of hand.

---

[9] As indicated below, a *Monell* claim is a claim that the City itself—and not just the individual who directly committed a constitutional violation—is a wrongdoer with respect to the constitutional violation (and thus can be held liable under § 1983).

By contrast, the final count against the City (Count 5) is not based on vicarious liability. Instead, "Count 5 is the '*Monell*' claim against the City."[10] (Doc. No. 23 at 9).

Under 42 U.S.C. § 1983, a local government may be held liable (on a *Monell* claim) for employee or agent actions *only* if they are executed pursuant to an official policy, custom, or practice. *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 690–91 (1978).

To substantiate a claim (i.e., a *Monell* claim) against a local government under § 1983, an aggrieved party must show that the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy[,]" inflicted the injury of which the aggrieved claims to have suffered. *Id.* at 694; *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). That policy or custom must be specific; if a complaint pleads facts that are "merely consistent with" liability, it "stops short of the line between possibility and plausibility of relief." *Hutchison v. Metro. Gov't of Nashville & Davidson, Cnty.*, 685 F. Supp. 2d 747, 751 (M.D. Tenn. 2010) (quoting *Twombly,* 550 U.S. at 570). There are four alternative methods of showing that the municipality had such a policy or custom; a plaintiff must prove one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (internal quotations omitted)).

---

[10] Via the quoted statement, Plaintiffs make clear that it is *only* Count 5 that is a *Monell* claim, thus confirming the Court's view that the City's purported liability on Counts 1 and 2 is not *Monell* liability but rather vicarious liability.

Defendants argue that Plaintiffs' claims under 42 U.S.C. § 1983 against the City fail to implicate a policy that supports municipal liability because (according to Defendants) these claims consist of what Defendants refer to as overbroad allegations of racial discrimination (Doc. No. 21 at 3), speculative allegations (*id.* at 5), non-specific allegations (in reference to Plaintiffs' claim of failure to train) (*id.* at 7), and "boiler plate" or "conclusory" attempts to plead a policy or custom (*id.* at 9).

Plaintiffs seem to blend two of the above methods for establishing *Monell* liability, namely the last two. That is, piecing together several paragraphs in Count 5, the Court concludes that they allege that the existence of a custom of tolerance or acquiescence of federal rights violations is shown by the City's failure to adequately train its law enforcement officers. (Doc. No. 17 at ¶¶ 89, 92, 93) ("The City of Clarksville, by and through the Clarksville Police Department as a sub-unit of city government, is in charge of hiring, training, supervising and disciplining its officers and employees within its control, such as Defendant Pacheco"; "[The] City of Clarksville, through its sub-unit the Clarksville Police Department, sustain and nourish a culture, customs and policies which are the moving force behind the abusive and constitutionally violative actions of the officers under its command, including Defendant Pacheco"; "As evidenced by the egregious violation of Ms. Patterson's person as well as the pretextual nature of the initial contact, the Clarksville Police Department, as an element of the City of Clarksville, has inadequately trained and/or disciplined its employees in the areas of racial bias, racial profiling and proper search procedures and policies.").

The Court notes that Plaintiffs' exact language here is that Defendants "inadequately trained and/or disciplined" its officers. The Court finds that this language is insufficient under *Iqbal* and *Twombly* to plausibly suggest an entitlement to relief under a *Monell* theory. Federal

Rule of Civil Procedure 8 requires that a plaintiff set forth facts "with sufficient specificity to state a claim for relief that is plausible on its face." *Nissan N. Am., Inc. v. Cont'l Auto. Sys., Inc.*, No. 3:19-CV-00396, 2019 WL 4820477, at *4 (M.D. Tenn. Oct. 1, 2019) (citing *Bedford v. Michigan*, 722 F. App'x 515, 517 (6th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009))). Plaintiffs fail to plead a factual allegation with sufficient specificity, hedging their bets (via the "and/or" wording) between inadequate "training" and inadequate "discipline." The Court acknowledges that a plaintiff is allowed to plead claims in the alternative, but it concludes that this principle is entirely inapplicable here; a plaintiff does not properly plead claims in the alternative when, in support of a single claim, the plaintiff merely makes a wholly conclusory claim that the defendant did X "and/or" Y; what such a plaintiff has done, instead, is merely highlight that he or she is merely guessing at what the plaintiff did, rather than asserting in the alternative (based on factual matter) that the defendant did each of two different things.

Plaintiff's *Monell* theory alternatively fails on other (albeit related) grounds. First, as regards the allegation of inadequate discipline, Plaintiffs have alleged absolutely no factual matter suggesting that (or how or why) members of the Clarksville Police Department are inadequately disciplined. So, this allegation is merely a conclusory assertion and thus, under *Iqbal and Twombly,* does not count towards a showing of plausibility of entitlement to relief.

Second, as regards the allegation of inadequate training, a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train (the third of the four options listed above). *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion)) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

To satisfy the third option for establishing liability under *Monell*, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id*. at 389. The standard for deliberate indifference is stringent and like that of recklessness: the municipality must have a conscious awareness of facts that infer the existence of a substantial risk of wrongdoing, draw an inference that the wrongdoing exists, and subsequently fail to correct the deficiency. *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). In most cases, a plaintiff must establish "a pattern of similar constitutional violations by untrained employees" that the government ignored to establish a Section 1983 claim under a theory of deliberate indifference. *Connick*, 563 U.S. at 62 (quoting *Board of Comm'rs of Bryan Cnty.*, 520 U.S. at 409); *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) (citing *inter alia Harris*, 489 U.S. at 378). Moreover, a plaintiff must show that the policy or custom was the "'moving force' or direct causal link" that brought about the defendant's action depriving the plaintiff of their constitutional rights. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996)). On occasion, a single egregious violation of constitutional rights, *coupled with* a failure to train employees to prevent further violations, can establish deliberate indifference on the part of a government entity. *Brown*, 520 U.S. at 409.

Even accepting all factual allegations as true in the instant matter, those allegations do not plausibly suggest that the City either knowingly created a policy or custom that could implicate § 1983 liability or was deliberately indifferent to actions such as those here allegedly carried out by Officer Pacheco or the other officers. As Defendants point out in their Memorandum, "this lawsuit

surrounds the Plaintiffs' contention that Officer Pacheco committed a search and seizure that was purportedly violative of the Fourth Amendment, but the Amended Complaint does not contain one single allegation of fact that identifies or describes any other specific search or seizure beyond the subject encounter involving Officer Pacheco." (Doc. No. 21 at 11).

Indeed, in the Amended Complaint, Plaintiffs point only to the incident underlying this lawsuit as factual support for inadequate training or discipline of Clarksville police officers. (Doc. No. 17 at ¶ 93). A single instance, without more, does not amount to a custom, policy or practice. *Jordan v. City of Detroit*, 557 F. App'x 450, 457 (6th Cir. 2014) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.") (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (clarified on other grounds by *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, (1986))). As noted above, in order to show the existence of a custom of tolerance of or acquiescence in federal rights violations, the single incident must be coupled with inadequate training. So, to adequately state a claim, a plaintiff must allege facts that plausibly suggest not only the single incident, but also the inadequate training; it is not enough to allege only the single incident in hopes that the court will infer therefrom that there was inadequate training—an inference this Court cannot and will not draw.

Apart from their singular experience, Plaintiffs argue that their Amended Complaint survives this Motion because (according to them) their factual allegations in the Amended Complaint easily meet the "'inferential' element, and in actuality amount to direct evidence of such intended discriminatory conduct." (Doc. No. 23 at 6) (citing *Amini v. Oberlin Coll.*, 440 F.3d

350, 358 (6th Cir. 2006)). This argument fails because it is wholly irrelevant; *Amini* involved a claim of racial discrimination under Section 1981. *Id.*

Plaintiffs also argue that numerous civil lawsuits—presumably the same ones referred to in the Amended Complaint—have been filed against the Clarksville police department for racial discrimination and a hostile work environment, and that "this history alone, with current leadership being long-term members of the department who were part of this documented culture, creates the rebuttable presumption that a racially biased culture remains." (Doc. No. 23 at 6). Plaintiffs' allegations merely contain broad or unsupported accusations, such as "the Clarksville Police Department has a well-documented history of racial animus toward African Americans which has resulted in numerous lawsuits on behalf of its own officers" and the City "through its sub-unit the Clarksville Police Department, sustain[s] and nourish[es] a culture, customs and policies which are the moving force behind the abusive and constitutionally violative actions of the officers." (*Id.* at ¶¶ 90, 92). But the mere filing of lawsuits is insufficient to show *anything*—be it deliberate indifference, a *de facto* policy of discrimination, or anything else. This is especially true because the cases cited by Plaintiffs all involve employment discrimination relating to a police department's internal hiring practice and workplace culture rather than instances of police violating citizens' federally protected rights. As such, these cases are irrelevant to Plaintiffs' Section 1983 claims—especially since those claims are based on constitutional guarantees against unreasonable search and seizure and false arrest/imprisonment rather than racial discrimination in violation of the Equal Protection Clause.

As previously stated, to survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). In *Iqbal*, the Court specifically extended this pleading standard to all civil actions and directed district courts to undertake a two-step analysis when considering a motion to dismiss: (1) "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (2) "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679.

Thus, although well-pleaded factual allegations in the Amended Complaint are to be treated as true for the purposes of this Motion, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In no less than ten (10) paragraphs in the Amended Complaint, Plaintiffs argue some sort of "racial animus" or "racial profiling" on the part of Officer Pacheco, her fellow officers, or the Clarksville police department. (Doc. No. 17 at ¶¶ 33, 35, 42, 51, 63, 77, 90, 91, 93). For example, Plaintiffs contend that "upon knowledge and belief, that the [Clarksville police] department continues to foster and promote an unwritten policy or custom that encourages racial profiling . . .." (Doc. 17 at ¶ 91). Such a bare assertion—without an impermissible speculation by this Court—does not survive the plausibility requirement under *Iqbal* and *Twombly*. And in any event, the allegations about racial profiling and racial animus against African-Americans are not relevant here (at least, not directly); the claims here are based on alleged violations of the Plaintiffs' rights *under the Fourth Amendment* rather than, for example, under the Equal Protection Clause.

Finally, without citing any authority or explaining the meaning or applicability here of purported "per se" liability, Plaintiffs, argue:

In creating statutory per se liability for violating Tennessee Code Annotated § 40-7-121(f),[11] the 98th General Assembly of the Tennessee Legislature was sending a clear message with TN H.B. 857 that the employing governmental entity was to be held accountable for such an egregious and constitutionally violate act as an illegal body cavity search. Implicit in this statutory language is the assumption that an officer conducting such an illegal search was not properly trained and/or supervised, as knowledge of its constitutional illegality should be undeniably obvious.

(Doc. No. 23 at 3). This argument could potentially support (if anything) not Count 5's claim under § 1983,[12] but rather Plaintiffs' state-law claim (Count 4) brought against the City.[13]

As for the § 1983 claim in Count 5, the Court finds that Plaintiffs have pled nothing more than legal conclusions against the City, rather than factual matter identifying a specific, official policy or custom of the City that was the "moving force" behind any alleged constitutional violation. Thus, Count 5 fails to state a Section 1983 claim against the City.

In sum, the Motion will be **granted** as to all of Plaintiffs' Section 1983 claims against the City (Counts 1, 2 and 5).

### B.    *Beamon's Section 1983 Claims against Officer Pacheco in her individual capacity (Count 1 and 2)*

Defendants argue that Beamon, having pled guilty to one charge of simple possession resulting from the search and seizure and having been granted judicial diversion, is now precluded from bringing *any* claim under Section 1983. (Doc. No. 21 at 15) (citing *Heck v. Humphrey*, 512

---

[11] Tennessee Code Annotated § 40-7-121(f) provides that "a law enforcement officer who conducts or causes to be conducted a body cavity search in violation of this section, and the governmental entity employing that officer, shall be subject to a civil cause of action as now provided by law."

[12] As pointed out by Defendants in their Reply, Tennessee Code Annotated § 40-7-121 is part of the Tennessee Code pertaining to criminal procedure, as the name of Title 40 – "Criminal Procedure"— expressly states. (Doc. No. 24-1 at 1-2). Therefore, its relevance to civil claims is questionable in any event.

[13] However, as discussed below, the Court declines to exercise jurisdiction over Plaintiffs' state-law claim against the City.

U.S. 477 (1994)). Plaintiffs argue that Beamon has no criminal conviction resulting from his state criminal case—specifically stating that "his criminal case has not been adjudicated as final"—and that therefore there is no conviction to be relitigated or challenged in this instant action. (Doc. No. 23 at 10).

The *Heck* doctrine bars a plaintiff from bringing a suit under the federal civil rights statute, 42 U.S.C. § 1983, where success on the claim would undermine a state-imposed conviction or sentence, unless that conviction or sentence has already been invalidated. In *Heck*, the Supreme Court confronted issues presented by specific kinds of § 1983 claims, namely claims "that necessarily require the plaintiff to prove the unlawfulness of his conviction or [past or present] confinement." *Heck v. Humphrey*, 512 U.S. 477, 486 (1994) (holding that a state prisoner's federal-court challenge to the lawfulness of his conviction may not be made in a suit for damages under Section 1983, but rather must go through federal habeas corpus, which in turn requires exhaustion, i.e., that state prisoners first seek redress in a state forum before coming to federal court).

Here, Beamon brings Section 1983 claims against Officer Pacheco for alleged violation of his Fourth Amendment rights to be free from unreasonable searches and seizures and false arrest. He alleges in particular that Officer Pacheco—lacking reasonable suspicion of criminal activity and probable cause—illegally searched Beamon's car and person, which led to an unlawful (i.e., without probable cause) arrest of Beamon for simple possession of marijuana. (Doc. No. 17 at 6-7).

To prevail on his Section 1983 claims of unreasonable search and seizure and false arrest, Beamon would have to undermine a state-imposed conviction or sentence, because to establish a lack of probable cause to search his car for drugs and subsequently arrest him for simple possession

of marijuana; this would necessarily demonstrate the invalidity of Beamon's arrest for simple possession. *See Heck*, 512 U.S. at 487, n.6 (determining that a plaintiff, who brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures, he would have to negate an element of the offense of which he has been convicted to prevail in the § 1983 action.).

Plaintiffs dispute whether Beamon was actually *convicted* in state court by entering into a "best interest" plea deal via judicial diversion, pursuant to T.C.A. 40-35-313, and (assuming Beamon complies with the terms of his deal), his plea of guilty will not remain on his record as a conviction. (Doc. No. 17 at ¶¶ 66, 67).

Based on *Heck*, and *Spencer v. Kemna*, 523 U.S. 1 (1998), the Sixth Circuit has held that "where the plaintiff was neither convicted nor sentenced and [therefore] was habeas-ineligible . . . *Heck* is inapplicable, and poses no bar to plaintiffs' [1983] claims."[14] *See S.E.*, 544 F.3d at 639. This logically flows from Justice Souter's rationale of the interplay between the federal civil rights statute (Section 1983) and the federal habeas statute (Sections 2241 or 2254), as discussed in his concurring opinion in *Spencer v. Kemna*, 523 U.S. 1, 20, (1998):

> In the manner of *Preiser v. Rodriguez*, 411 U.S. 475, [ ] (1973), I read the "general" § 1983 statute in light of the "specific" federal habeas statute, which applies only to persons "in custody," 28 U.S.C. § 2254(a), and requires them to exhaust state remedies, § 2254(b). [*Heck*, 512 U.S., at 497]. I agreed that "the statutory scheme

---

[14] It remains unsettled among district courts within the Sixth Circuit as to whether a defendant's entry into a judicial diversion program constitutes a judgment of conviction for purposes of the *Heck* doctrine. *See Butts v. City of Bowling Green*, 374 F. Supp. 2d 532, 537 (W.D. Ky. 2005) (holding pretrial diversion under Kentucky law is not a criminal conviction for purposes of *Heck*); *but see Hall v. Thompson*, No. CV 05-155-GFVT, 2006 WL 8445401, at *7 (E.D. Ky. Sept. 29, 2006) ("A majority of the courts squarely considering the issue have determined that entry into a diversion program is an 'unfavorable termination of the criminal charge' pursuant to *Heck*") (collecting cases); *Holloran v. Duncan*, 92 F. Supp. 3d 774, 800 (W.D. Tenn. 2015), *amended*, No. 13-1050, 2015 WL 12434364 (W.D. Tenn. Apr. 23, 2015) ("under Sixth Circuit precedent, plaintiffs who plead guilty and receive judicial diversion are precluded from pursuing a Fourth Amendment claim for unlawful arrest.") (quoting *Bolden v. City of Euclid*, No. 1:12 CV 1666, 2013 WL 5935614, at *6–7 (N.D. Ohio Nov. 1, 2013), *aff'd* 595 Fed. Appx. 464 (6th Cir. 2014), *pet. for cert. filed*, No. 14–1103 (Mar. 9, 2015)).

must be read as precluding such attacks," [*id*., at 498], not because the favorable-termination requirement was necessarily an element of the § 1983 cause of action for unconstitutional conviction or custody, but because it was a "simple way to avoid collisions at the intersection of habeas and § 1983." *Ibid*.

*Spencer*, 523 U.S. at 20. Because the applicability of the *Heck* bar turns on whether the plaintiff had received a conviction or sentence, [15] it becomes important for this Court first to assess exactly how Tennessee conceives of (i) the notions of "conviction" and "sentence"; and (ii) pretrial judicial diversion, particularly with respect to whether it results in a "conviction" or "sentence," and then determine whether the factual matter set forth *in the Complaint* (or, potentially, whatever other additional, limited kinds of information may be considered on a Rule 12(b)(6) motion to dismiss) makes it implausible that Beamon's particular pretrial judicial diversion did not result in a conviction under Tennessee law; only if the answer to the latter question is "yes" can the Court say that the Complaint makes it implausible that the *Heck* bar does not apply) and for that reason fails to plausibly suggest an entitlement to relief under Section 1983.

_____

[15] The Sixth Circuit, in *S.E. v. Grant County Board of Education*, 544 F.3d 633, 639 (6th Cir. 2008), discussed a circuit split as to whether a pretrial diversion program counts as a favorable termination of the conviction or sentence such that a § 1983 action challenging the conviction can proceed, and indicated the boundaries of *Heck* to be unsettled. *See e.g., Taylor v. Gregg*, 36 F.3d 453, 455–56 (5th Cir. 1994) (holding that pretrial diversion programs are not favorable terminations); *Vasquez Arroyo v. Starks*, 589 F.3d 1091, 1095 (10th Cir. 2009) ("The diversion agreements resulted in deferral of prosecution of the offenses at issue. As a consequence . . . there are no 'outstanding judgments' or 'convictions or sentences' against [the plaintiff]."); *Roesch v. Otarola*, 980 F.2d 850, 853 (2d Cir. 1992) ("[W]e hold [that a] trial rehabilitation program is not a termination in favor of the accused for purposes of a civil rights suit."); *Gilles v. Davis*, 427 F.3d 197, 211 (3d Cir. 2005) ("[W]e hold the [pretrial diversion] program is not a favorable termination under Heck.").

   But the Sixth Circuit ultimately held, in consideration of *Spencer v. Kemna*, 523 U.S. 1, 20 (1998), that the *Heck* bar to § 1983 claims did not require a favorable termination of the criminal proceedings for plaintiffs who were not eligible to make habeas petitions. Therefore, the Sixth Circuit announced its disagreement with First, Third, Fifth, and Eighth Circuit determinations that in spite of *Spencer*, § 1983 claimants who were not eligible for habeas relief remained bound by *Heck's* favorable termination requirement. Put another way, in the Sixth Circuit, without a conviction or sentence, a finding of favorable termination is not required.

   Accordingly, because it remains unclear in the instant matter whether Beamon was convicted or sentenced, this Court does not require a favorable termination in order for Beamon to avoid the *Heck* bar.

Apparently like most jurisdictions, Tennessee recognizes two distinct meanings of the term "conviction." *Rodriguez v. State,* 437 S.W.3d 450, 455 (Tenn. 2014) (citing *State v. Vasser*, 870 S.W.2d 543, 545 (Tenn. Crim. App. 1993)). A conviction in the "general sense" is the establishment of guilt by a guilty plea or a verdict independent of sentence and judgment. *Vasser*, 870 S.W.2d at 546; *see also Daughenbaugh v. State*, 805 N.W.2d 591, 597 (Iowa 2011) (defining "conviction" in the "general or popular sense" as "the establishment of guilt independent of judgment and sentence"). In contrast, a conviction in its "technical" sense requires a formal adjudication by a court and the entry of a judgment of conviction. *Vasser*, 870 S.W.2d at 545–46; *see also Daughenbaugh*, 805 N.W.2d at 597 ("[W]hen the term 'conviction' is used in its technical [or] legal sense, it requires a formal adjudication by the court and the formal entry of a judgment of conviction."). The applicable meaning of conviction depends on the context or procedural setting in which the term is used. *Vasser*, 870 S.W.2d at 546.

Under Tennessee's judicial diversion statute, a judgment of conviction is not entered against a defendant who participates in judicial diversion, even when he has been found guilty, or enters a plea of guilty or nolo contendere. *White v. Wilson*, No. 1:18-CV-00093, 2019 WL 4276993, at *6 (M.D. Tenn. Sept. 10, 2019) (citing Tenn. Code Ann. § 40-35-313; *Rodriguez v. State,* 437 S.W.3d 450, 455 (Tenn. 2014)). The plea or verdict is held in abeyance and further proceedings are deferred under reasonable conditions during a probationary period established by the trial court. Tenn. Code Ann. § 40–35–313(a)(1)(A). Judicial diversion may be ordered only with the defendant's consent. *Id*. If the defendant violates the conditions of judicial diversion, the trial court may "enter an adjudication of guilt and proceed as otherwise provided." Tenn. Code Ann. § 40–35–313(a)(2). If the defendant successfully completes his period of diversion, however, the trial court discharges the defendant and dismisses the proceedings without court adjudication

of guilt or the entry of a judgment of guilt. Tenn. Code Ann. § 40–35–313(a)(2). An individual who enters into a judicial diversion plea may end up with a criminal conviction or he may not, depending on whether he complies with his probation. *Santini v. Rausch*, No. 3:20-CV-00661, 2021 WL 2043083, at *8 (M.D. Tenn. May 21, 2021).

In reviewing the Amended Complaint, it becomes apparent that the Court cannot at this stage determine whether Beamon's pretrial judicial diversion via a plea agreement constitutes a conviction—or alternatively whether that agreement could be considered a sentence—under Tennessee law.[16]

Defendants' raise only the *Heck* doctrine as a basis for dismissing Beamon's Section 1983 claims. Therefore, the Court will **deny** the Motion as to Beamon's Section 1983 claims of unreasonable search and seizure and false arrest/imprisonment (Counts 1 and 2) against Officer Pacheco.

### C. Patterson's Section 1983 Claims against Officer Pacheco in her individual capacity (Counts 1 and 2)

Patterson brings Section 1983 claims for the violation to her Fourth Amendment rights to be free from unreasonable searches and seizures and false arrest/imprisonment, specifically alleging that Officer Pacheco—without having reasonable suspicion of criminal activity—illegally and intrusively searched Patterson's person twice, and that Patterson was unlawfully detained while officers continued their search. (Doc. No. 17 at 6-7).

---

[16] The Court is aware that Plaintiffs attached Beamon's plea agreement as an exhibit to their Response (Doc. No. 23-1), but the Court cannot consider what was not attached as—and therefore to be considered in conjunction with—the Complaint. But the Court does have the discretion, and indeed intends, to review Beamon's plea agreement—as well as the entirely of his criminal case filed in Montgonery County General Sessions—at the summary judgment stage.

Defendants do not address either of Patterson's Section 1983 claims (Counts 1 or 2) in their Motion or Memorandum. As discussed above, on a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc.,* 552 F.3d at 433. So, Officer Pacheco, as the movant is the one seeking dismissal, bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim. *Cf Detrick v. KCS Int'l Inc*., 781 F. Supp. 3d 588, 623 (N.D. Ohio 2025), *reconsideration denied*, No. 5:24-CV-1154, 2025 WL 1697482 (N.D. Ohio June 17, 2025) (providing that it is well established that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997); *Gradisher v. City of Akron*, 794 F.3d 574, 586 (6th Cir. 2015) (same)).

Therefore, the Court will **deny** the Motion as to Patterson's Section 1983 claims (Counts 1 and 2) against Officer Pacheco.

### D.    *State-Law Claims (Counts 3 and 4)*

As the above discussion makes clear, there remains for discussion claims by both Plaintiffs under Count 3 against Officer Pacheco, and Patterson's claim under Count 4 against Officer Pacheco.

(1) <u>Plaintiffs' IIED claims against Officer Pacheco (Count 3)</u>

To establish a claim for IIED under Tennessee law, a plaintiff must show that (1) the defendant acted either intentionally or recklessly in a manner (2) so outrageous that civilized society will not tolerate, and that (3) the conduct resulted in the plaintiff's serious mental injury. *Doe v. Vanderbilt Univ*., 2019 U.S. Dist. LEXIS 173269, *53 (M.D. Tenn. 2019) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)); s*ee also Rogers v. Louisville Land Co*., 367 S.W.3d

196, 205 (Tenn. 2012), *abrogated on different grounds by, Youree v. Recovery House of E. Tennessee, LLC*, 705 S.W.3d 193 (Tenn. 2025). "To say that Tennessee courts narrowly define 'outrageous conduct' would be something of an understatement." *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 903 (M.D. Tenn. 2018). The conduct must be "atrocious," "utterly intolerable," and "beyond all bounds of decency." *Goldfarb v. Baker*, 547 S.W.2d 567, 569 (Tenn. 1977). As the Tennessee courts have explained:

> In describing these elements, we have emphasized that it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress. A plaintiff must in addition show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004) (internal citations and quotation marks omitted) (emphasis added); *see also* Restatement (Second) of Torts § 46 cmt. d, at 73 (1965); *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) (discussing standard under identical Ohio law). It is clear from this explanation that (a) the standard is not whether an aggrieved person (such each of the Plaintiffs here) subjectively considers a party's actions to have been so outrageous, but whether a civilized society (objectively) would so find, and (b) a plaintiff must prove that the conduct is outrageous in character, and not just in motive. *Doe*, 334 F. Supp. 3d at 903.

Since intentional and reckless conduct can form the basis of claims for IIED, the alleged offender does not need to *intend* to cause emotional distress but rather merely must *act recklessly* in doing so. *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 503 (Tenn. 2012) (quoting John J. Kircher, *The Four Faces of Tort Law: Liability for Emotional Harm*, 90 Marq. L. Rev. 789, 799 (2007)).

A plaintiff seeking damages for IIED must meet an "exacting standard." *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999). "Recovery for intentional infliction of emotional distress is limited to mental injury which is so severe that no reasonable person would be expected to endure it." *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003). The Tennessee Supreme Court had made it clear that there should not be recovery for "'every minor disturbance to a person's mental tranquility,' but only for serious or severe emotional injuries." *Rogers*, 367 S.W.3d at 208 (quoting *Barnhill v. Davis*, 300 N.W.2d 104, 107 (Iowa 1981)). There should be no recovery for fright or fear alone or "hurt feelings, trivial upsets, or temporary discomfort." *Id*. (quoting *Ramsey v. Beavers*, 931 S.W.2d 527, 532 (Tenn. 1996)). There is a goal the rule that liability can be imposed only when extreme and outrageous conduct causes serious or severe emotional distress: to avoid the judicial system being flooded with potentially fraudulent, manufactured, or overstated claims arising from the "transient and trivial" emotional distresses of daily life, recognizing that "[i]f the plaintiff is to recover every time that [his or] her feelings are hurt, we should all be in court twice a week." *Rogers*, 367 S.W.3d at 209 (quoting William L. Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich. L. Rev. 874, 877 (1939)). Rather, recovery should be only for "serious or severe emotional injuries which disable a reasonable, normally constituted person from coping adequately with the stress." *Ramsey*, 931 S.W.2d at 532. Given this high bar, "[a] trial court may reasonably dismiss this legal theory as a matter of law." *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010).

To assess whether a plaintiff has suffered a serious mental injury, courts may look to several factors, which include:

(1) Evidence of physiological manifestations of emotional distress, including but not limited to nausea, vomiting, headaches, severe weight loss or gain, and the like;

(2) Evidence of psychological manifestations of emotional distress, including but not limited to sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry;

(3) Evidence that the plaintiff sought medical treatment, was diagnosed with a medical or psychiatric disorder such as post-traumatic stress disorder, clinical depression, traumatically induced neurosis or psychosis, or phobia, and/or was prescribed medication;

(4) Evidence regarding the duration and intensity of the claimant's physiological symptoms, psychological symptoms, and medical treatment;

(5) Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and

(6) In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury.

*Rogers*, 367 S.W.3d at 209-210.

The Court will consider Plaintiffs' respective IIED claims against Officer Pacheco separately, starting with Beamon.

Considering what the Amended Complaint does (and does not) allege, the extent of Beamon's and Officer Pacheco's interaction is as follows: Officer Pacheco questioned Beamon on his presence in his car outside his apartment in the early morning hours of July 11, 2022, (Doc. No. 17 at ¶ 14); Beamon "was removed from his vehicle"[17] and searched against his wishes, (*Id.* at ¶ 16); and Officer Pacheco placed Beamon under arrest for marijuana found in his car as result of the officers' search (*Id.* at ¶¶ 24-25). Defendants argue that "[i]n essence, Plaintiff Beamon alleges that Officer Pacheco lied and/or was mistaken about smelling marijuana coming from Plaintiff Beamon's car (and/or his person) and, overall, did not have 'probable cause or reasonable suspicion that a crime or some type of violation had occurred.'" (Doc. No. 21 at 22) (quoting Doc.

---

[17] As the Court mentioned *supra* note 2, Plaintiffs do not specify beyond this how Beamon "was removed," in what way he "was removed," or who removed him from the car.

No. 17 at ¶ 45). Defendants also argue that Plaintiffs did not plead any specific factual allegations regarding any severe mental injury (the third element) sustained by Beamon. (Doc. No. 21 at 23). In their Response, Plaintiffs do not address these arguments and merely reallege their claims of racial discrimination and profiling, mainly focusing on Patterson's claim. (Doc. No. 23 at 13).

Considering the guiding Tennessee law set forth above, the Court concludes that the Amended Complaint fails to set forth factual matter plausibly suggesting that Officer Pacheco's conduct in relation to Beamon was sufficiently outrageous in character to support the second element of a claim of IIED. Even if the Amended Complaint plausibly suggests that Officer Pacheco's search was unfair or unreasonable, it is not so atrocious, so beyond the bounds of decency, so utterly intolerable to society that it meets the demanding Tennessee standard for an IIED claim; thus, the Amended Complaint contains insufficient factual matter to plausibly suggest the existence of the second element.

As to the third element, Beamon asserts via the Amended Complaint that he "suffered mental distress as a result of being racially profiled and harassed in his own car outside his home" (Doc. No. 17 at ¶ 77). This falls short of what Tennessee state law requires to support an IIED claim, considering what *Rogers* identifies as a "serious mental injury":

> (1) Evidence of physiological manifestations of emotional distress, including but not limited to nausea, vomiting, headaches, severe weight loss or gain, and the like;

> (2) Evidence of psychological manifestations of emotional distress, including but not limited to sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry;

> (3) Evidence that the plaintiff sought medical treatment, was diagnosed with a medical or psychiatric disorder such as post-traumatic stress disorder, clinical depression, traumatically induced neurosis or psychosis, or phobia, and/or was prescribed medication;

(4) Evidence regarding the duration and intensity of the claimant's physiological symptoms, psychological symptoms, and medical treatment;

(5) Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and

(6) In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury.

*Id.* at 209-10.

Accordingly, the Court will **grant** the Motion as to Beamon's IIED claim against Officer Pacheco.

As for Patterson's IIED claim against Officer Pacheco, it of course is based on the specific interaction(s) between Patterson and Officer Pacheco. Defendants, taking as true the allegations within the Amended Complaint, do not dispute that the outrageous requirement is satisfied as it relates to Patterson. (Doc. No. 21 at 24). Instead, Defendants argue that Patterson's mental injury does not reach the level of severity required for an IIED claim—i.e., challenging the third element of her IIED claim. *Id.* Plaintiffs strongly push back on this point, asserting that the Amended Complaint's allegations satisfy this requirement, and that *Rogers* does not require medical proof of an injury. (Doc. No. 23 at 14).

As a brief recap, as alleged in the Amended Complaint, the interaction between Patterson and Officer Pacheco involved Officer Pacheco ignoring Patterson's declination to be searched and proceeding to grope Patterson's breast and nipples and digitally penetrate Patterson's vagina. (Doc. No. 17 at ¶¶ 18-21). Patterson continued to object to the search, even informing Officer Pacheco that she had nothing hidden in her breasts or vagina. (*Id*. at ¶ 22). Then after the search of Patterson's person and while she was handcuffed, Officer Pacheco searched Patterson for a second time in the same private areas despite Patterson's continued protests. (*Id*. at ¶¶ 26-28). In the end, Patterson was neither arrested nor charged with any crime. (*Id*. at ¶ 29). As a result of this search,

Patterson alleges she now suffers from severe mental distress: "liv[ing] in fear of police officers," "afraid to step foot outside of her house for more than a week" after the incident, and "continues to live with the severe emotional impact of having her body violated in a manner tantamount to rape." (*Id*. at ¶ 82).

Body-cavity searches, by their nature, are invasive and intimate, and courts have found that allegations of them are sufficient to plausibly suggest the second element of an IIED claim (outrageous conduct). *See e.g., Leuthauser v. United States*, No. 2:20-CV-479 JCM (MDC), 2025 WL 1798879, at *2 (D. Nev. June 25, 2025) (holding "digital penetration" on its own as "likely sufficient to show extreme or outrageous conduct"); *Knopek v. City of Warren*, No. 23-13028, 2025 WL 1466785, at *10 (E.D. Mich. Mar. 19, 2025) (holding even in lawful arrests, a "plaintiff's allegation of unlawful digital penetration" suffices to support a claim of IIED under Michigan law). It is plausible that such conduct would produce a lifetime of emotional and psychological damage, humiliation, embarrassment and emotional distress, that could "disable a reasonable, normally constituted person from coping adequately with the stress."

And in the Court's view, the plausibility of this is not diminished simply because this was a same-sex sexual assault. *Cf Hailey v. Beard*, No. 19-2171, 2020 WL 406654, at *1 (E.D. Pa. Jan. 24, 2020) ("We today review same-sex sexual assault upon a man awaiting trial by a male officer…[and we] find the pretrial detainee pleads a claim . . .for intentional infliction of emotional distress against the alleged officer-perpetrator.") (applying Pennsylvania law).

Therefore, given the sufficiency of the factual allegations in the Amended Complaint to plausibly suggest the elements of IIED, the Court will not dismiss Patterson's IIED claim at this stage. Thus, the Court will **deny** the Motion as to Patterson's IIED claim against Officer Pacheco.

(2) <u>Patterson's Civil Battery Claim Against Officer Pacheco (Count 4)</u>

In their Motion, Defendants do not address Patterson's civil battery claim against Officer Pacheco. As discussed above, on a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc.*, 552 F.3d at 433. Defendants have not met their burden as to Patterson's civil battery claim against Officer Pacheco, and therefore that claim will remain.

As for Patterson's civil battery claim against the City, Defendants argue that because Plaintiffs do not allege independent negligent conduct on the part of the City, the City remains immune from Plaintiffs' civil battery claim under the Tennessee Governmental Tort Liability Act ("GTLA"), pursuant to Tennessee Code Annotated § 29-20-201 *et seq*. (Doc. No. 21 at 12).

The GTLA provides immunity to governmental entities from suits that implicate the actions of officials exercising or discharging governmental functions, with some exceptions. *See* Tenn. Code. Ann. § 29-20-201. One such exception removes immunity for "injuries proximately caused by a negligent act or omission of any employee within the scope of [a governmental entity's employee's] employment." Tenn. Code Ann. § 29-20-205. However, from this exception, Tenn. Code Ann. § 29-20-205 in turn excepts the following intentional torts (among others)[18]: "[f]alse imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, *invasion of right of privacy*, or civil rights." Tenn. Code Ann. § 29-20-201(2)

---

[18] The torts listed in Subsection 2 are intentional torts. a list of intentional torts, *Hughes*, 340 S.W.3d at 368 (noting that Subsection 2 provides "a list of intentional torts" that constitute an exception to the exception. In addition to the intentional torts listed in Subsection 2, other subsections of Tenn. Code Ann. § 29-20-205 provide an exception to the exception for injuries arising out of other actions that may amount to torts (even if not necessarily intentional torts), such as malicious prosecution—and apparently, based on particular wording used, prosecution even if it is *not malicious*— and intentional or negligent misrepresentation. *See* Tenn. Code Ann. §§ 29-20-205(5), (6).

(emphasis added). That is, subsection (2) of Tenn. Code Ann. § 29-20-205 (hereinafter, "Subsection (2)") provides an exception to Tenn. Code Ann. § 29-20-205's exception to sovereign immunity; in other words, where applicable, Subsection (2)'s exception-to-the-exception[19] effectively grants governmental entities sovereign immunity.

Applying the doctrine of *expressio unius est exclusio alterius*,[20] courts have held that intentional torts not mentioned ("unlisted intentional torts"), such as assault or battery, can form the basis for a claim against a governmental entity—i.e., are not excepted-from-the exception and thus are not within the scope of immunity—provided the plaintiff can make direct showings of the governmental entity's negligence that precipitated the intentional tort.[21] *Hughes v. Metro. Gov't*

---

[19] The term(s) used herein, "exception to the exception" (or something similar) refers to an exception to the exception to immunity—and thus to something that *is* (at least generally) within the scope of immunity.

[20] This Latin expression translates to "the express inclusion of one thing excludes other things." *Iles v. Metro. Gov't of Nashville & Davidson Cnty.*, 500 F. Supp. 3d 711, 714 n.3 (M.D. Tenn. 2020).

[21] It is not self-evident from the wording of the Tenn. Code Ann. § 29-20-205 that satisfying this proviso—that governmental entity's negligence precipitated the unlisted intentional tort—is required for the plaintiff to defeat a claim of immunity. The actual wording of the statute as a whole (especially its introductory paragraph and Subsection (2)) arguably suggests that immunity is non-existent whenever an injury to the plaintiff arises out of a governmental entity's employee's commission of an unlisted intentional tort—such that the governmental entity could be liable for that tort under a *respondeat superior* or theory of vicarious liability for the governmental entity that requires no showing of negligence on the part of the governmental entity to hold it liable. But the Tennessee Supreme Court has rejected any such suggestion and explained that (and why) the proviso exists:

> In *Limbaugh,* a resident made a direct showing that the defendant nursing home, a governmental entity, had failed "to take reasonable precautions to protect its residents from the risk of abuse by th[e] aggressive nursing assistant" who committed an assault against the resident. *Id.* Because the governmental entity negligently supervised its employee, and the resident suffered an injury from an intentional tort, assault and battery, not included in the enumerated list in section 29–20–205(2), we held that the governmental entity's immunity from suit was removed. *Id.* Since 2001, the Court of Appeals has correctly interpreted *Limbaugh* to mean that "the GTLA does not allow plaintiffs to hold governmental entities vicariously liable for intentional torts not exempted under section 29–20–205(2), but rather requires a direct showing [of] negligence on the part of the governmental entity." *Pendleton v. Metro. Gov't of Nashville & Davidson Cnty.,* No. M2004–01910–COA–R3–CV, 2005 WL 2138240, at *3 (Tenn. Ct. App. Sept. 1, 2005); *see also Baines v. Wilson Cnty.,* 86 S.W.3d 575, 581 (Tenn. Ct. App. 2002). Because an

*of Nashville & Davidson Cnty., Tenn.*, 340 S.W.3d 352, 368 (Tenn. 2011); *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 84 (Tenn. 2001).

Tennessee law defines a civil battery as "any intentional, unlawful and harmful (or offensive) contact by one person with the person of another." *Raines v. Shoney's Inc.*, 909 F. Supp. 1070, 1083 (E.D. Tenn. 1995) (citing T.P.I. Civil § 8.02). However, some unconsented physical contact does not rise to a level "so offensive" as to constitute a battery. *Reagan v. City of Knoxville*, 692 F. Supp. 2d 891, 904 (E.D. Tenn. 2010) (quoting *Runions v. Tennessee State University*, No. M2008-01574-COA-R3-CV, 2009 WL 1939816, at *4 (Tenn. Ct. App. 2009)). Tennessee common law requires that the contact be so offensive that it "infringes on a reasonable sense of personal dignity ordinarily respected in civilized society." *Doe v. Mama Taori's Premium Pizza, LLC*, No. M1998-00992-COA-R9-CV, 2001 WL 327906, at *4 (Tenn. Ct. App. Apr. 5, 2001) (citing Restatement (Second) of Torts § 18(1) (Am. Law Inst. 1965); 1 Fowler W. Harper, et al., *The Law of Torts* § 3.2 (3d ed. 1996); 1 Dan B. Dobbs, *The Law of Torts* § 28, at 52-53 (2001)).

Defendants claim that under the GTLA the City has immunity from liability for Officer Pacheco's two searches of Patterson because "the Plaintiffs fail to make any allegations supporting an independent claim of negligence against the City – i.e., allegations suggesting that Officer Pacheco's purported intentional battery of Plaintiff Patterson arose from or was caused by the

---

assault or a battery is not a negligent act, *see Limbaugh,* 59 S.W.3d at 84, the "negligent act or omission" required to waive immunity under section 29–20–205 does not refer to the intentional tort. When, therefore, there has been no showing of negligence by the governmental entity in supervision of one of its employees acting within the scope of employment, the exception to sovereign immunity set forth in section 29–20–205 will not apply.

*Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 368–69 (Tenn. 2011). All of this means, among other things, that the City cannot be held liable for Officer Pacheco's alleged battery merely because she was employed by the City. *See Pendleton v. Metro Gov't of Nashville & Davidson Cnty.*, No. M2004-01910-COA-R3-CV, 2005 WL 2138240, at * 4 (Tenn. Ct. App. Sept. 1, 2005) (holding that the GTLA abrogates common law theories of vicarious liability/*respondeat superior*).

negligent act or omission of another employee or agent of the City." (Doc. No. 21 at 13). The Court agrees, for multiple reasons. First, Plaintiffs do not argue to the contrary in their Response. Second, neither the word "negligent" nor the word "negligence" appears anywhere in the Amended Complaint. Third, to the extent that Plaintiffs' allegations that the City failed to train, supervise or discipline could be deemed to constitute allegations of "negligence," that make no difference here because those allegations: (i) are made expressly in support of a *Monell* claim, which relates solely to a Section 1983 claim and not state-law claims like the one in Count 4, (Doc. No. 17 at 14); and (ii) those allegations come *after* Count 4 and are not incorporated into Count 4, which incorporates only the paragraphs (1 through 82) that *precede* it (*id.* at 13).

Plaintiffs instead are relegated to arguing that Tennessee Code Annotated § 40-7-121 renders inapplicable the GTLA (and any immunity that it otherwise may offer the City) with respect to a claim based on a body-cavity search. Plaintiffs rely specifically on the following subsection of Tennessee Code Annotated § 40-7-121: "A law enforcement officer who conducts or causes to be conducted a body cavity search in violation of this section, and the governmental entity employing that officer, shall be subject to a civil cause of action as now provided by law," Tenn. Code Ann. § 40-7-121(f). According to Plaintiffs, § 40-7-121(f) conflicts with the GTLA provisions that otherwise might offer immunity for body-cavity searches, because it imposes *per se* liability on municipalities (and the searching officers) for body-cavity searches. Plaintiffs further assert that Tennessee Supreme Court guidance on interpreting conflicting statutes provides that: "[w]here a conflict is presented between two statutes, a more specific statutory provision takes precedence over a more general provision." (Doc. No. 23 at 5) (quoting *Coffman v. Armstrong Int'l, Inc.*, 615 S.W.3d 888, 894 (Tenn. 2021)) (quoting *State v. Frazier*, 558 S.W.3d 145, 153 (Tenn. 2018)).

Relying on this language, Plaintiffs contend that "Tenn. Code Ann. § 40-7-121 carves out a distinct, clear, and unambiguous exception with regard bringing a civil cause of action against a government entity that employs an officer that has conducted an illegal body cavity search, as opposed to the broad spectrum of catch all immunity afforded to a government entity under GTLA." (Doc. No. 23 at 5). The Court disagrees. Tenn. Code Ann. § 40-7-121 renders the searching officer, and the municipality that employs her, "subject to a civil cause of action *as now provided by law*." Tenn. Code Ann. § 40-7-121(f) (emphasis added). Based on the phrase "[a]s now provided by law," the Court construes subsection (f) to mean that the municipality and the searching officer are subject to defending a civil cause of action for a body-cavity search to the extent that they were so subject *under the law as it existed when Tenn. Code Ann. § 40-7-121 was enacted*, and did not serve to *change* existing law on this point by eliminating whatever immunity then existed for a cause of action based on a body-cavity search. *Cf. Balden v. State*, 127 S.W. 134, 139 (Tenn. 1909) (holding that in providing that "from this panel the grand and petit juries shall be made up, as now provided by law," a particular 1901 statute did not change existing law prescribing the method for making up grand and petit juries).

Notably, this construction of subsection (f)—whereby the law (including the GTLA's immunity provisions) regarding liability for a body-cavity search would remain the same as before—would not render Tenn. Code Ann. § 40-7-121(f) superfluous; the statute as many other provisions that *did* change the law regarding body cavity searches, and as construed by the Court, subsection (f) would serve the meaningful purpose of clarifying that the law was *not* being changed with respect to causes of action against officers and their municipal employers for body cavity searches. Thus, Tennessee Code Annotated § 40-7-121(f) does not affect the GTLA's immunity

provisions in any way—and under those provisions Plaintiffs must still allege negligence on the part of the City to sustain a battery claim against it; and they do not.

Therefore, given the GTLA's provisions the Amended Complaint does not plausibly suggest that the City can be held liable for Officer Pacheco's alleged battery against Patterson. Therefore, the Court will **grant** the Motion as to Patterson's civil battery claim against the City.

(3) <u>Patterson's Civil Battery Claim Against the City (Count 4)</u>

As noted above, Patterson's federal claims against the City (Counts 1, 2, and 5) will be dismissed. Plaintiffs allege only one basis for this Court's jurisdiction over Patterson's state-law claims: supplemental jurisdiction (formerly known as "pendent" jurisdiction) under 28 U.S.C. § 1367(a). (Doc. No. 17 at ¶ 9).

A district court may decline to exercise supplemental jurisdiction over claims if: (1) the state claims raise "novel or complex" issues of State law, (2) those claims substantially predominate over the claims where federal original jurisdiction exists, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) "exceptional circumstances," offer "compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). As relevant here, then, the court can dismiss claims falling solely within its supplemental jurisdiction, once it has dismissed all claims over which it has original jurisdiction (generally meaning federal claims or state-law claims where there is diversity of citizenship). 28 U.S.C. § 1367(c)(3).

Moreover, this discretion can be exercised on a defendant-by-defendant basis. In other words, the court has the discretion to dismiss state-law claims against a particular defendant upon the dismissal of all claims against that defendant over which the court had original jurisdiction —

meaning, in the instant case, only the Section 1983 claims,[22] which as just noted all have been dismissed against the City. And this is true even if claims within the court's original jurisdiction remain against other defendant(s), as they do in this case given that claims remain pending against Officer Pacheco.

To take just one example, in *Harris-Thomson v. Riverhead Charter School Bd. of Trs.*, 2016 WL 11272084, at *5 (E.D.N.Y. Feb. 23, 2016), the court emphasized that supplemental jurisdiction may be declined over state-law claims against particular defendants after the dismissal of federal claims against those defendants, even when a claim over which the court had original jurisdiction (in that case, a federal claim) remained pending against another party. And this Court has adopted the defendant-by defendant approach:

> With the dismissal of [the plaintiff's] federal claims against [one particular defendant], the Court will not retain jurisdiction over the state law claims against that Defendant because, pursuant to 28 U.S.C. § 1367(c)(3), there is a "strong presumption in favor of declining to exercise jurisdiction over supplemental state-law claims after dismissing federal anchor claims[.]" *Martinez v. City of Cleveland*, 700 F. App'x 521, 523 (6th Cir. 2017). This holds true even where, as here, federal claims remain against other defendants. *See, e.g., Ryan v. Illinois Dep't of Children & Family Servs.*, 185 F.3d 751, 764-65 (7th Cir. 1999); *Oilfield Services, LLC v. Pecha*, 2013 WL 3458163 (W.D. Pa. July 9, 2013); *Timeline, Inc. v. Proclarity Corp.*, No. C05-1013JLR, 2007 WL 1574069, at *10 (W.D. Wash. May 29, 2007); *Spearman v. Tom Wood Pontiac-GMC*, Inc., 2001 WL 1712506 at * 7 (S.D. Ind. Dec. 3, 2001).

*Medlin v. City of Algood*, 355 F. Supp. 3d 707, 719 (M.D. Tenn. 2019) (Crenshaw, C.J.).

---

[22] In some cases, a court has original (subject-matter) jurisdiction over state-law claims under 28 U.S.C. § 1332, which provides for original jurisdiction where there is so-called diversity of citizenship. But this is not one of those cases. Plaintiffs do not allege diversity of citizenship and instead allege original jurisdiction only in the form of federal-question jurisdiction under 28 U.S.C. § 1331. (Doc. No. 17). Jurisdiction over all of Plaintiffs' state-law claims is premised solely on supplemental jurisdiction, and not original jurisdiction.

Relatedly, the Court notes that all claims over which a federal court lacks original (subject-matter) jurisdiction are state-law claims, but not all state-law claims are ones of which a federal court lacks original jurisdiction (because a federal court *does* have original jurisdiction over state-law claims where diversity of citizenship exists).

Here, the Court perceives no basis for overcoming the "strong presumption" of declination of supplemental jurisdiction referred to in *Medlin*. Accordingly, the Court declines to exercise supplemental jurisdiction over the state-law claims against the City, and those claims will be dismissed without prejudice.

### E. Punitive Damages Against the City

The Court has already dismissed all Counts against the City, so Defendants' final contention (that punitive damages are not available against governmental entities under Section 1983 or under the GTLA) is moot. Additionally, Plaintiffs do not refute that they cannot be awarded punitive damages against the City in their Response. (*See* Doc. No. 23). The Court therefore takes this issue as settled, with the conclusion being that punitive damages against the City are not available to Plaintiffs.

<u>CONCLUSION</u>

For the reasons stated herein, the Court will **GRANT** the Motion as to the following claims: (1) all claims against Officer Pacheco in her official capacity; (2) Beamon's and Patterson's Section 1983 claims (Counts 1, 2, and 5) against the City; (3) Beamon's IIED claim (Count 3) against Officer Pacheco. Additionally, the Court declines to exercise supplemental jurisdiction over Patterson's civil battery claim (Count 4) against the City, and so that claim will be dismissed without prejudice.

The Court will **DENY** the Motion as to the following claims: Beamon's and Patterson's Section 1983 claims (Counts 1 and 2) against Officer Pacheco and Patterson's state-law claims of IIED and civil battery (Count 3 and 4) against Officer Pacheco.

An appropriate corresponding order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE