IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CASSANDRA PATTERSON; and FRANK BEAMON, | ) ) ) | NO. 3:23-CV-00682 |
| Plaintiffs, | ) ) | JUDGE RICHARDSON |
| v. | ) ) | |
| CITY OF CLARKSVILLE; and LYSSED PACHECO, in her individual and official capacities, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**<u>MEMORANDUM OPINION</u>**

Pending before the Court is a motion for summary judgment filed by Defendants, City of Clarksville and Officer Lyssed Pacheco, (Doc. No. 34, "Motion"), wherein Defendants seeks summary judgment in their favor on all counts of the amended complaint (Doc. No. 17, "Amended Complaint") filed by Plaintiffs, Cassandra Patterson ("Patterson") and Frank Beamon ("Beamon"). Defendants filed a memorandum in support of the Motion (Doc. No. 50-1, "Memorandum") and a statement of facts (Doc. No. 35, "Defendants' Facts"). Plaintiffs filed a response in opposition to the Motion (Doc. No. 42, "Response"), along with responses to Defendants' Facts (Doc. No. 42-1, "Responses to Defendants' Facts"). Defendants filed a reply (Doc. No. 44, "Reply") to Plaintiffs' Response.

The Motion is now moot with respect to many of Plaintiffs' claims, that is, the claims dismissed pursuant to the Court's order (Doc. No. 53, "Order"), which was filed after the Motion was filed, on Defendants' motion to dismiss (Doc. No. 20). In light of that Order, the remaining

claims before the Court are: (i) Beamon's and Patterson's claims in Counts 1 and 2[1] under 42 U.S.C. § 1983 ("Section 1983" or "§ 1983") against Officer Pacheco and (ii) Patterson's state-law claims (for IIED and civil battery) in Counts 3 and 4 against Officer Pacheco.[2]

For the reasons stated herein, Defendants' Motion will be **GRANTED IN PART** and **DENIED IN PART**.

LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by*

---

[1] Within each of the Counts, Plaintiffs have combined multiple claims, that is, one or more claims on behalf of each Plaintiff against one or more Defendants. To break down and address each of these claims, the Court will refer to Beamon's Count 1 as "Count 1a" and Patterson's Count 1 as "Count 1b." Like references will apply to Count 2: Beamon's Count 2 is herein referred to as "Count 2a" and Patterson's Count 2 as "Count 2b." Moreover, when addressing a particular claim within either Count 1 or 2, the Court will refer to it is "part of" a Count—for example, a claim for unreasonable search only, rather than the combined unreasonable search and seizure, will herein be referred to as "part of Count 1."

[2] Notably, no claims remain against (former) Defendant City of Clarksville, but since Defendant City of Clarksville was a co-filer of the Motion—which was filed when claims were still pending against Defendant City of Clarksville—the movants herein are referred to as "Defendants," plural.

*Young v. United Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support the [existence of a] material fact," Fed. R. Civ. P. 56(c)(1)(B), for example, the existence of an element of a nonmovant plaintiff's claim. If the summary judgment movant meets its initial burden, then in response the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Pittman*, 901 F.3d at 628 (quoting *Anderson*, 477 U.S. at 250).[3] Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex,* 477 U.S. at 322).

Any party asserting that a fact cannot be or genuinely is disputed (*i.e.*, any party seeking summary judgment and any party opposing summary judgment, respectively) can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the

---

[3] Courts (appropriately) at times refer interchangeably to (i) a party being able (or unable) to raise a genuine issue as to fact and (ii) a reasonable jury being able (or unable) to find in the party's favor on that fact. This Court does likewise herein.

adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1)(B).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (citing *Anderson*, 477 U.S. at 248). Likewise, the "court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman*, 901 F.3d at 628 (citing *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

A defendant-movant cannot meet its initial burden on motion for summary judgment merely by *claiming* that the plaintiff lacks evidence and essentially challenging the plaintiff to show otherwise; a defendant-movant must—by pointing to materials of record or otherwise—*show* (presumptively, i.e., subject to the plaintiff's response) that the plaintiff could not prove his claim

by a preponderance. *See* Fed. R. Civ. P. 56(c)(1).[4] In other words, the defendant-movant must produce evidence *tending to show* (though not necessarily *conclusively showing*) that the plaintiff cannot raise a genuine issue as to any material fact.[5] *Nickols v. Morris*, 705 F. Supp. 2d 579, 584–85 (N.D. Tex. 2010) ("The party moving for summary judgment has the initial burden of informing the Court of the basis for his motion and producing evidence which tends to show that no genuine issue as to any material fact exists and that he is entitled to judgment as a matter of law."), *aff'd*, 419 F. App'x 534 (5th Cir. 2011).

---

[4] The undersigned rejects cases that have indicated otherwise. For example, the following cases do not go quite so far as to say that a defendant-movant need not show—by pointing to materials of record or otherwise—presumptively that the plaintiff could not prove his claim by a preponderance, but they could be understood to suggest as much. *See, e.g.*, *O.M.A., S.r.l. v. Simon DeYoung Corp.*, No. 1:10-cv-0861, 2013 WL 7210503, at *3 (N.D. Ohio Mar. 12, 2013) ("[A summary judgment] movant in federal court is not required to . . . provide evidence to show that his opponent has no evidence"), *R&R adopted in part, rejected in part on other grounds*, No. 1:10-cv-00861, 2014 WL 587171 (N.D. Ohio Feb. 14, 2014); *Goldcorp, Inc. v. United States*, No. 00-75043, 2002 WL 551042, at *6 (E.D. Mich. Mar. 27, 2002) ("At any rate, even if [the] affidavit were altogether stricken from the record, it appears that the Government still would be entitled to summary judgment in its favor. After all, this affidavit has been provided merely to prove a negative: namely, that there is no evidence that the IRS ever received the protective claim allegedly sent by Plaintiff on or before September 15, 1995. Presumably, then, the Government could have simply asserted this proposition in its brief, and left it to Plaintiff to introduce evidence calling this issue into question.").

[5] Notably, a defendant-movant typically can show that there is no genuine issue as to any material fact by showing that there is no genuine issue as to the existence of a fact (usually, the element of a claim) that absolutely needs to exist for the plaintiff to prevail. If the defendant-movant can make this showing, all other facts become immaterial (because the plaintiff necessarily will suffer summary judgment anyway), and thus it can be said that the plaintiff (being unable to show a genuine issue as to *one* material fact) cannot raise a genuine issue as to *any* material fact. *See Meecorp Capital Mkts. LLC v. Tex-Wave Indus LP*, 265 F. App'x 155, 158 (5th Cir. 2008) ("If the movant [like the typical defendant seeking summary judgment as to the plaintiff's claims and like the typical plaintiff moving for summary judgment as to an affirmative defense] . . . does not bear the burden of proof, he should be able to obtain summary judgment simply by disproving the existence of any essential element of the opposing party's claim or affirmative defense." (quoting *Fontenot v. Upjohn Co.*, 780 F.2d at 1190, 1195 (5th Cir. 1986))).

<u>DISCUSSION</u>[6]

Defendants move for summary judgment, contending that the undisputed material facts show that: (1) the warrantless search of Beamon's car was constitutional because there was probable cause to search the car, considering the odor of marijuana emitting from the car and Beamon's statement that his friends smoked marijuana in the car in the recent past (Doc. No. 50-1 at 10-11); (2) Officer Pacheco's pat-down search of Patterson was reasonable to search for weapons and contraband, considering the odor of marijuana and a statement from Officer Aragon that something may be between Patterson's legs when she exited Beamon's vehicle (*id*. at 15); (3) Patterson failed to plead a "serious mental injury" to establish a claim for intentional inflection of emotional distress (*id*. at 40-41); and (4) Officer Pacheco is entitled to qualified immunity for a civil battery claim under Tennessee law (*id*. at 25).

Naturally, the ability of Plaintiffs' claims to survive the Motion turns largely on what material facts the Court should treat as undisputed (and thus are effectively established for purposes of the Motion); those facts are laid out in the following paragraphs.

---

[6] The facts that are stated herein without qualification are undisputed—a term the Court will use to describe both facts that are not in dispute *at all* and facts that are not in *genuine* dispute—and are treated as such. Alleged facts that are qualified here in some way (as for example by being prefaced with something like "Defendant asserts that" or "Plaintiff claims that") are in dispute and are treated as such. Some of the facts contained herein come from record evidence (such as depositions) and are cited (as being accurate) by the opposing parties in their respective briefing. Other facts (background, uncontroversial ones) are mutually stated in the parties' opposing briefings.

There are other purported facts that are disputed but are evidentially supported and are asserted by Plaintiffs and Defendants, respectively, to support their respective views that there is (according to Plaintiffs) or is not (according to Defendants) a genuine issue of material fact as to a particular claim. The Court refers to these purported facts, and the evidence supporting them, in appropriate places in its analysis below.

In the Responses to Defendants' Facts, Plaintiffs admit that various facts asserted by Defendants are undisputed for purposes of summary judgment.[7] Those facts, which are set forth below verbatim in bold, and Defendants' citations in support of those facts are as follows (albeit with an enumeration different than the enumeration in Defendants' Facts):

1. **In the early morning/pre-dawn hours of July 11, 2022, Officer Pacheco, Officer Joseph Aragon (hereinafter, "Officer Aragon"), and Officer Juan Mazuera (hereinafter, "Officer Mazuera") (referred to collectively, from time to time, as the "Officers") were conducting a foot patrol in the area of 408 Jack Miller Boulevard in Clarksville, Tennessee.** (See Officer Pacheco's Responses to Interrogatories at Nos. 2, 3, and 4, Transcript of Depo. of Officer Pacheco at p. 13, l. 8 – 18, and the Officers' body-worn camera videos, generally.).

2. **Plaintiff Frank Beamon's (hereinafter, "Mr. Beamon") vehicle, an SUV, parked in the parking lot of an apartment complex at 408 Jack Miller Boulevard with its engine running.** (See Officer Pacheco's Responses to Interrogatories at Nos. 3, 4, and 12, Transcript of Depo. of Officer Pacheco at p. 17, l. 1 – 6, and at pp. 18 – 20, Officer Pacheco's Statement at page bearing Bates stamp "Pacheco 013" (excerpt from Responses to Requests for Production), Officer Mazuera's Statement at page bearing Bates stamp "Pacheco 015" (excerpt from said Responses), Officer Aragon's Statement at page bearing Bates stamp "Pacheco 014" (excerpt from said Responses), Transcript of Depo. of Plaintiff Beamon at p. 13, l. 17 – 22, and the Officers' body-worn camera videos, generally.).

3. **Officer Pacheco then walked toward the vehicle and shined her flashlight through the vehicle's tinted windows (on the rear passenger side), thereby discovering that persons (now known to be the Plaintiffs) were inside the vehicle in the back seat.** (See Officer Pacheco's body-worn camera video, beginning at 17 sec. mark, Officer Pacheco's Responses to Interrogatories at Nos. 3, 4, and 12, and Transcript of Depo. of Plaintiff Beamon at p. 30, l. 7 – 20.).

4. **Prior to so utilizing her flashlight to discover Plaintiffs, Officer Pacheco had not seen (and could not see) inside the vehicle, and she did not know whether anyone was inside the vehicle.** (See Transcript of Depo. of Officer Pacheco at p. 17, l. 11, and at p. 20, l. 18 – 21, and Officer Pacheco's Responses to Interrogatories at Nos. 3 and 4.).

5. **Officer Pacheco then tapped on the window of the vehicle's rear passenger door and Plaintiff Cassandra Patterson (hereinafter, "Ms. Patterson"), who was sitting in the back seat on the passenger side, opened the rear passenger door.** (See Officer Pacheco's body-worn camera video, beginning

---

[7] That is not to say or suggest that Plaintiffs admit the *materiality* of any or all these facts.

at 26 sec. mark, Officer Aragon's body-worn camera video at 1 min., 57 sec. mark (advising he smelled the odor of marijuana), Officer Pacheco's Responses to Interrogatories at Nos. 3, 4, and 12, Transcript of Depo. of Officer Pacheco at p. 21, l. 6 – 10, and at p. 23, l. 19 – 20, and Officer Aragon's Statement at page bearing Bates stamp "Pacheco 014" (excerpt from Responses to Requests for Production). See also Transcript of Depo. of Plaintiff Beamon at p. 15, l. 17 (testifying that officers told him at the scene that "they smelled marijuana"), and at p. 16, l. 21 – 24 (Q – "But you did hear the officers say that they had smelled marijuana when they opened the car door?" A – "Yeah . . . . [Y]es, sir."), and Transcript of Depo. of Plaintiff Patterson at p. 34, l. 10 – 12, and at p. 25, l. 13 – 19.).

6. **Moments after Ms. Patterson opened the door, Officer Pacheco stated to Plaintiffs, "We're in the area looking for like vehicle burglaries and stuff like that okay, because we've had a bunch of them here recently," and Mr. Beamon responded in pertinent part as follows: "Yeah, I know. The landlord told us . . . about the burglaries."** (See Officer Pacheco's body-worn camera video at 1 min. mark. See also Transcript of Depo. of Plaintiff Beamon at p. 35, l. 10 – 17 (testifying he told Officer Pacheco that he heard about the car break-ins from his landlord)).

7. **After Officer Pacheco engaged in some initial dialogue with Plaintiffs (concerning their identities, why they were in the vehicle, and other matters), Mr. Beamon exited the vehicle at the request of one of the Officers, stepped behind the vehicle, and Mr. Beamon then consented to a search of his person.** (See Officer Pacheco's body-worn camera video, beginning at 3 min., 30 sec. mark, approximately (consent occurring at 3 min., 41 sec. mark, approximately), Transcript of Depo. of Plaintiff Beamon at p. 14, l. 12 – 18, and at p. 15, l. 1 – 2 (testifying, "then he said that he needed to search me, and I said he could")).

8. **After the consensual search of Mr. Beamon's person was completed by one of the male Officers, Officer Pacheco advised Mr. Beamon that she "could smell marijuana coming from [the] car," and Mr. Beamon then denied that he smoked marijuana.** (See Officer Pacheco's body-worn camera video at 4 min., 30 sec. mark, Transcript of Depo. of Plaintiff Beamon at p. 23, l. 20 – 23 (conceding he advised Officer Pacheco that his friends had smoked marijuana in the vehicle), and Transcript of Depo. of Officer Pacheco at p. 24, l. 10 – 12).

9. **After advising Mr. Beamon that she had obtained probable cause to search the vehicle, Officer Pacheco asked Ms. Patterson to exit the vehicle, and Officer Pacheco then conducted a search of Ms. Patterson's person (hereinafter, the "First Search").** (See Officer Pacheco's body-worn camera video at 6 min., 5 sec. mark. (with the First Search beginning at 6 min., 35 sec. mark, approximately), and Officer Aragon's body-worn camera video, the First Search beginning at 2 min., 40 sec. mark, approximately).

10. **Following the First Search, Officer Pacheco and Officer Aragon conducted a search of Mr. Beamon's vehicle, during which those Officers found two bags of commercially-packaged marijuana (having a total preliminary weight of 54 grams), scales, a baggy, and cash.** (See Transcript of Depo. of Officer Pacheco at p. 34, l. 1 – 25, Officer Pacheco's body-worn camera video, vehicle search beginning at 7 min., 25 sec. mark, approx. (with search of the rear cargo area beginning at 14 min. mark, approx.), Officer Aragon's body-worn camera video, vehicle search beginning at 3 min., 25 sec. mark, approx. (with search of the rear cargo area beginning at 10 min. mark, approx.), Officer Pacheco's Responses to Requests for Admissions at Nos. 24 and 25, Officer Pacheco's Responses to Interrogatories at No. 7, Captain Thornton's Complaint Investigation Summary at page bearing Bates stamp "Pacheco 010" (excerpt from Responses to Requests for Production), and Officer Pacheco's written Statement at page bearing Bates stamp "Pacheco 013" (excerpt from those Responses)).

11. **While Officer Pacheco and Officer Aragon were conducting the search of the vehicle, Officer Aragon advised Officer Pacheco that he had seen something between Ms. Patterson's legs when she had exited the vehicle, but he was not certain what it was.** (See Officer Pacheco's body-worn camera video at 8 min., 15 sec. mark, Transcript of Depo. of Officer Pacheco at p. 28, l. 11 – 14, and at p. 29, l. 4 – 8, and Officer Pacheco's Responses to Interrogatories at No. 24.).

12. **During the First Search and the Second Search, Officer Pacheco was wearing white gloves on her hands, and Ms. Patterson was wearing a firmly-fitting one-piece black dress, the length of which ran from her shoulders nearly to her ankles.** (See Officer Pacheco's body-worn camera video at 6 min., 45 sec. mark, and at 29 min., 10 sec. mark, and Transcript of Depo. of Plaintiff Patterson at p. 38, l. 1 – 9, and at p. 145, l. 16 – 18).

13. **The black dress was the only clothing Ms. Patterson wore during the First Search and Second Search, as she was not wearing a bra, underwear, or any other clothing beneath the dress.** (See Transcript of Depo. of Plaintiff Patterson at p. 37, l. 16 – 25).

14. **The First Search and Second Search occurred in the semi-darkness in the parking lot of Mr. Beamon's apartment complex while only law enforcement personnel and Plaintiffs were present.** (See Officer Pacheco's body-worn camera video at 6 min., 35 sec. mark, and at 29 min., 10 sec. mark, Officer Mazuera's body-worn camera video at 24 min., 50 sec. mark, and Officer Aragon's body-worn camera video at 2 min., 40 sec. mark.).

15. **In the First Amended Complaint, Ms. Patterson alleges that, during the First Search, "[Officer] Pacheco proceeded to go up under Ms. Patterson's dress and insert her fingers into Ms. Patterson's vagina" as part of a "warrantless body cavity search" but, at her deposition, Ms. Patterson**

abandoned those allegations, admitting Officer Pacheco's hands did not go under her dress during the First Search and asserting that vaginal penetration "happened on the second search" – not during the First Search. (See First Amended Complaint (Doc. 17) at ¶¶ 21, 22, 55, 78, and 86, and Transcript of Depo. of Plaintiff Patterson at p. 43, l. 7 – 12, at p. 45, l. 5 – 7, at p. 46, l. 3 – 6, at p. 53, l. 17 – 20, at p. 129, l. 21 – 22, and at p. 137, l. 22 – 25 (Q – "Did she put her hand up your dress [during the First Search]?" A – "No.").

16.  **Likewise, during the Second Search, Officer Pacheco's gloved hands were in the area of (and/or were upon) Ms. Patterson's breasts (over/outside her dress).** (See Officer Pacheco's body-worn camera video at 29 min., 10 sec. mark, and Officer Mazuera's body-worn camera video, at 24 min., 56 sec. mark.).

17.  **Because of the preliminary weight of the marijuana (i.e., 54 grams) recovered from Mr. Beamon's vehicle, a drug agent for the City had to be summoned to the scene, and said agent arrived at approximately 4:30 a.m.** (See Officer Pacheco's Responses to Interrogatories at No. 7, and Officer Pacheco's Responses to Requests for Admissions at No. 20.).

18.  **While detained inside Officer Pacheco's patrol car, Ms. Patterson made the following statement to Mr. Beamon: "I should have just let you use my body spray. Then, they would have never smelled it."** (See Officer Pacheco's in-car camera video at 18 min., 33 sec. mark.).

19.  **Mr. Beamon replied: "Damn. I didn't even think of that [expletive]."** (See Officer Pacheco's in-car camera video at 18 min., 33 sec. mark.).

20.  **Plaintiffs' detention ended upon the City drug agent's completion of her on-site investigation.** (See Officer Pacheco's Responses to Interrogatories at No. 7, Transcript of Depo. of Plaintiff Patterson at p. 67, l. 5 – 8, and at p. 55, l. 16 to p. 56, l. 5, and the Officers' body-worn camera videos, generally.).

21.  **When the on-site investigation concluded, Mr. Beamon (having received a written citation) did not go to jail, but was released from custody and immediately reported to his place of employment to start his work day.** (See Transcript of Depo. of Plaintiff Beamon at p. 33, l. 3 – 8, and Transcript of Depo. of Plaintiff Patterson at p. 56, l.6 – 10.).

22.  **Ms. Patterson asserts that, as a result of the subject incident, she was not able to leave her house for one week (out of alleged fear), and began attending counseling sessions… – one year and two months after the incident; those sessions, however, have addressed a number of issues and/or incidents (including a prior rape, a prior molestation, and childhood-related issues) having nothing whatsoever to do with the incident giving rise to this lawsuit.**

(See Transcript of Depo. of Plaintiff Patterson at pp. 88 – 89, at p. 92, l. 12 – 16, at p. 100, l. 3, and at pp. 101 – 102.).

   23. **Ms. Patterson is not on any medication, and she has started a travel business, which she continues to operate.** (See Transcript of Depo. of Plaintiff Patterson at p. 93, l. 9 – 10, and at p. 94, l. 4 – 17.).

(Doc. No. 42-1). These are the only undisputed facts before the Court.

Defendants have submitted body camera footage in support of their Motion, as shown in the multiple citations above. On a motion for summary judgment "[w]hen there is a video record of the incident, [the court] take[s] the facts as they appear in the video, which may not necessarily be in the light most favorable to the nonmoving party . . .." *Nelson v. City of Battle Creek*, 802 Fed. Appx. 983, 985 (6th Cir. 2020) (citing *Scott v. Harris*, 550 U.S. 372, 378-80 (2007)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. However, "[a]ny remaining gaps or ambiguities in the facts as recorded in the video, however, are to be viewed in the light most favorable to the nonmoving party." *Nelson*, 802 F. App'x at 985–86 (citing *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017)). As the Sixth Circuit put it very recently:

> [W]here videos in the record "show facts so clearly that a reasonable jury could view those facts in only one way," we must view the facts in the light depicted by the videos. *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). If the facts shown in the videos can be interpreted multiple ways, the facts should be interpreted in the light most favorable to the nonmoving party. *Id.*

*Guptill v. City of Chattanooga, Tennessee*, 160 F.4th 768, 776 (6th Cir. 2025).

Accordingly, the facts that the Court will consider undisputed for purposes of the Motion are (only) the undisputed written facts quoted above, plus any facts that are *plainly* apparent in the

body camera footage, construing any ambiguities in the facts in the light most favorable to the nonmoving party.[8]

## I.    Beamon's Section 1983 Claims and the *Heck* Doctrine

As an initial matter, the Court turns to whether Beamon, having pled guilty to one charge of simple possession resulting from the search and seizure and having been granted judicial diversion, is now precluded from bringing a claim under Section 1983 pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), and its progeny. Defendants contend that Beamon's Section 1983 claims are barred by the so-called *Heck* doctrine (Doc. No. 50-1 at 45), while Plaintiffs argue that because (according to Plaintiffs) Beamon has no criminal conviction resulting from incident at issue here, the so-called *Heck* doctrine does not bar Beamon's Section 1983 claims (Doc. No. 42 at 21).

As hinted at above, the *Heck* doctrine bars a plaintiff from bringing a suit under the federal Section 1983 where success on the claim would undermine a state-imposed conviction or sentence, unless that conviction or sentence has already been invalidated. In *Heck*, the Supreme Court confronted issues presented by specific kinds of Section 1983 claims, namely claims "that necessarily require the plaintiff to prove the unlawfulness of his conviction or [past or present] confinement." *Heck*, 512 U.S. at 486 (holding that a state prisoner's federal-court challenge to the lawfulness of his conviction may not be made in a suit for damages under Section 1983, but rather must go through federal habeas corpus, which in turn requires exhaustion, i.e., that state prisoners first seek redress in a state forum before coming to federal court).

---

[8] Citations to the video shall reflect the time (hour/minute/second) as it appears in the top right corner of the video when viewed via a computer screen—e.g., Pacheco Body Camera, 2:52:30-2:52:45, reflecting the starting and ending junctures of the video segment to which the Court is citing.

The Sixth Circuit has held that "where the plaintiff was neither convicted nor sentenced and [therefore] was habeas-ineligible . . . *Heck* is inapplicable, and poses no bar to plaintiffs' [1983] claims." [9] *See S.E. v. Grant County Board of Education*, 544 F.3d 633, 639 (6th Cir. 2008). Because the applicability of the *Heck* bar turns on whether the plaintiff received a conviction or sentence, it becomes important for this Court to (1) to assess exactly how Tennessee conceives of the notions of "conviction" and "sentence" and pretrial judicial diversion,[10] particularly with respect to

---

[9] The Sixth Circuit has ruled that *Heck* is inapplicable—and therefore poses no bar to a plaintiff's claims— where the plaintiff was neither convicted nor sentenced and was habeas-ineligible. *S.E.*, 544 F.3d at 639. This logically flows from Justice Souter's rationale of the interplay between the federal civil rights statute (Section 1983) and the federal habeas statute (Section 2241 or 2254), as discussed in his concurring opinion in *Spencer*:

> I read the "general" § 1983 statute in light of the "specific" federal habeas statute, which applies only to persons "in custody," 28 U.S.C. § 2254(a), and requires them to exhaust state remedies, § 2254(b). [*Heck*, 512 U.S., at 497]. I agreed that "the statutory scheme must be read as precluding such attacks," [*id*., at 498], not because the favorable-termination requirement was necessarily an element of the § 1983 cause of action for unconstitutional conviction or custody, but because it was a "simple way to avoid collisions at the intersection of habeas and § 1983." Ibid.

*Spencer*, 523 U.S. at 20. In *S.E.*, the Sixth Circuit announced that—despite *Spencer*—a § 1983 claim does not require a favorable termination of the criminal proceedings for a plaintiff who was *not* eligible for habeas relief. Put another way, in the Sixth Circuit, without a conviction or sentence, a finding of favorable termination is not required.

Accordingly, because—as discussed in detail below—Beamon's entering a guilty plea as part of judicial diversion did not render him either convicted or sentenced, this Court does not require a favorable termination in order for Beamon to avoid the *Heck* bar.

[10] Some district courts within the Sixth Circuit seem to agree that a defendant's entry into a judicial diversion program does not constitute a judgment of conviction (or, for that matter, alternative a sentence) for purposes of the *Heck* doctrine. *See Butts v. City of Bowling Green*, 374 F. Supp. 2d 532, 537 (W.D. Ky. 2005) (holding pretrial diversion under Kentucky law is not a criminal conviction for purposes of *Heck*); *Santini v. Rausch*, No. 3:20-CV-00661, 2021 WL 2043083, at *7 (M.D. Tenn. May 21, 2021) (stating, in a case where a Section 1983 plaintiff who had been placed on judicial diversion in circuit court in Tennessee claimed that he had not thereby been "convicted" for purposes of the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act ("Act"), Tenn. Code Ann. § 40-39-201 *et seq.*, that "[the plaintiff's] claim would seem to fall outside the ordinary boundaries of the *Heck* bar, as it is usually defined, because it does not challenge either a 'conviction' or a 'sentence.'") It is worth noting, however, that the determination of whether entry into a judicial diversion program constitutes a conviction (or sentence) could vary based upon the particular characteristics of the judicial diversion protocol at issue, which in turn could vary based on (among other things) the state and locality involved.

whether it results in a "conviction" or "sentence," and then (2) determine whether the factual matter in the instant matter shows that Beamon's particular pretrial judicial diversion did not result in a conviction under Tennessee law.

Apparently like most jurisdictions, Tennessee recognizes two distinct meanings of the term "conviction." *Rodriguez v. State,* 437 S.W.3d 450, 455 (Tenn. 2014) (citing *State v. Vasser*, 870 S.W.2d 543, 545 (Tenn. Crim. App. 1993)). A conviction in the "general sense" is the establishment of guilt by a guilty plea or a verdict independent of sentence and judgment. *Vasser*, 870 S.W.2d at 546; *see also Daughenbaugh v. State*, 805 N.W.2d 591, 597 (Iowa 2011) (defining "conviction" in the "general or popular sense" as "the establishment of guilt independent of judgment and sentence"). In contrast, a conviction in its "technical" sense requires a formal adjudication by a court and the entry of a judgment of conviction. *Vasser*, 870 S.W.2d at 545–46; *see also Daughenbaugh*, 805 N.W.2d at 597 ("[W]hen the term 'conviction' is used in its technical [or] legal sense, it requires a formal adjudication by the court and the formal entry of a judgment of conviction."). The applicable meaning of conviction depends on the context or procedural setting in which the term is used. *Vasser*, 870 S.W.2d at 546.

Under Tennessee's judicial diversion statute, a judgment of conviction is not entered against a defendant who participates in judicial diversion, even when he has been found guilty, or enters a plea of guilty or *nolo contendere*. *White v. Wilson*, No. 1:18-CV-00093, 2019 WL 4276993, at *6 (M.D. Tenn. Sept. 10, 2019) (citing Tenn. Code Ann. § 40-35-313; *Rodriguez v. State,* 437 S.W.3d 450, 455 (Tenn. 2014)). The plea or verdict is held in abeyance and further proceedings are deferred under reasonable conditions during a probationary period established by the trial court. Tenn. Code Ann. § 40–35–313(a)(1)(A). Judicial diversion may be ordered only with the defendant's consent. *Id*. If the defendant violates the conditions of judicial diversion, the

trial court may "enter an adjudication of guilt and proceed as otherwise provided." Tenn. Code Ann. § 40–35–313(a)(2). If the defendant successfully completes his period of diversion, however, the trial court discharges the defendant and dismisses the proceedings without court adjudication of guilt or the entry of a judgment of guilt. Tenn. Code Ann. § 40–35–313(a)(2). An individual who enters into a judicial diversion plea may end up with a criminal conviction or he may not, depending on whether he complies with his probation. *Santini v. Rausch*, No. 3:20-CV-00661, 2021 WL 2043083, at *8 (M.D. Tenn. May 21, 2021).[11]

Moreover, it is well settled under Tennessee case law that the decision to grant judicial diversion and the judicial diversion probationary period that results do not constitute a sentence. *State v. Dycus*, 456 S.W.3d 918, 926 (Tenn. 2015) (citing *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014) ("[T]he conditional probationary period incident to the grant of judicial diversion does not qualify as a sentence per se.")); *State v. Turco,* 108 S.W.3d 244, 248 (Tenn. 2003)

---

[11] In *Santini* this Court summarized things as follows:

> [J]udicial diversion [is] "a form of legislative largess available to qualified [Tennessee] defendants who have entered a guilty or nolo contendere plea or have been found guilty of an offense without the entry of a judgment of guilt." *State v. Dycus*, 456 S.W.3d 918, 925 (Tenn. 2015) (quoting *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014)). When a plaintiff is granted judicial diversion, the court "place[s] the defendant on probation upon such reasonable conditions as it may require without entering a judgment of guilty and with the consent of the qualified defendant." Tenn. Code Ann. § 40-35-313(a)(1)(A). In other words, judicial diversion permits a court to place a consenting defendant on probation while nevertheless formally freezing his case in a sort of limbo between a plea (or finding) of guilt—which has already occurred—and the actual entry of a judgment reflecting that guilt—which has not. "If, during the period of probation, the person does not violate any of the conditions of the probation, then upon expiration of the period, the court shall discharge the person and dismiss the proceedings against the person." Tenn. Code Ann. § 40-35-313(a)(2). That dismissal is "without court adjudication of guilt" and, unless some more specific provision indicates otherwise, "shall not be deemed a conviction for purposes of disqualifications or disabilities imposed by law upon conviction of a crime or for any other purpose." *Id.* If, however, the defendant violates the terms of his probation while on judicial diversion, "the court may enter an adjudication of guilt." *Id.*

*Santini*, 2021 WL 2043083, at *1.

(rejecting argument that judicial diversion constitutes a sentence under the Tennessee Rules of Criminal Procedure); *State v. Messer,* No. E2013–00647–CCA–R3–CD, 2014 WL 259706, at *3 (Tenn. Crim. App. Jan. 22, 2014) ("Judicial diversion, is not now, and never has been, a sentence…"); *State v. Patel,* No. M2012–02130–CCA–R3–CD, 2013 WL 3486944, at *8 (Tenn. Crim. App. July 10, 2013) (Witt, J., concurring) ("Our case law is clear that a judicial diversion term is not a sentence under the terms of the Sentencing Act."); *Alder v. State,* 108 S.W.3d 263, 267 (Tenn. Crim. App.2002) ("The judicial diversion probationary period is not a sentence nor is it punishment.").

Rather, "[t]he grant or denial of judicial diversion is a *decision to either defer or impose a sentence*." *King,* 432 S.W.3d at 324–25 (emphasis added). Indeed, under the judicial diversion statute, the grant or denial of judicial diversion takes place after a defendant "is found guilty of or pleads guilty or nolo contendere to the offense" but "without entering a judgment of guilty." Tenn. Code Ann. §§ 40–35–313(a)(1)(A), (a)(1)(B)(i).

In their Response, Plaintiffs contend that Beamon, who entered into a "best interest" plea deal via judicial diversion, pursuant to Tennessee Code Annotated § 40-35-313, was not actually *convicted* in state court, and therefore, his criminal case has not been adjudicated as final. (Doc. No. 42 at 21). In support of this, Plaintiffs provide what is purportedly a screen capture of the state court's online record, and based on that screen capture, Plaintiffs argue that Beamon's state court case was dismissed. (Doc. No. 42 at 22). Viewing the screen capture, however, the Court can surmise only that a hearing for "Diversion Set for Dismissal" was scheduled for October 27, 2023; there is no indication that the hearing took place; no indication of the outcome of the hearing if it did take place; and no indication that the information within the screen capture is even related to the incident (or more specifically Beamon's simple possession charge) at issue here. By Plaintiffs'

own acknowledgement, this screen capture is "not binding," (*id*.); the Court would use the term, "not probative here."

What the Court can—and does—rely on instead is Beamon's deposition testimony cited in Plaintiffs' response to Defendants' Facts: that "after entering a diversionary plea, [Beamon] had his case dismissed and has [had] or will ha[ve] his record expunged." (Doc. No. 42-1 at ¶ 35). Additionally, Plaintiffs rely on language within Beamon's plea agreement,[12] which provides in relevant part under a section entitled as "Petition for Conditional Diversion":

> I understand that my plea of guilty has been accepted but adjudication of guilt is withheld. I understand that if I do not do what I pledge to do while on probation, I may be arrested; if the Court finds that I have not complied with probation, I will be found guilty and I may be required to serve a sentence for the crime to which I have entered plea of guilty.

(Doc. No. 23-1 at 2). Defendants via their Reply refute neither that Beamon had his state court case dismissed (and has had or will have his state record expunged) nor the apparent meaning of the language within Beamon's plea agreement (above). Thus, the Court accepts as undisputed that Beamon's simple possession charge was dismissed and the language within Beamon's plea agreement as provided above.

Tennessee case law makes clear that (1) a judgment of conviction is not entered against a defendant who participates in judicial diversion and (2) the decision to grant judicial diversion and the judicial diversion probationary period that results do not constitute a sentence. Likewise, the above language from the state court order makes clear that "adjudication of guilt was withheld" in

---

[12] Plaintiffs purport that Beamon's plea agreement is attached to their Response as "Exhibit 1" (Doc. No. 42 at 22); however, no such exhibit was attached to the Response. Fortunately for Plaintiffs, Beamon's plea agreement was attached as an "Exhibit 1" (Doc. No. 23-1) to Plaintiffs' response (Doc. No. 23) to Defendants' motion to dismiss.

Beamon's state court criminal case.[13] There can be no conviction without an adjudication of guilt. Without a conviction or sentence, the *Heck* doctrine does not come into play.

It is undisputed that as a part of his plea agreement, Beamon entered a judicial diversion for his criminal charge of simple possession in relation to the incident at issue, but was not convicted or sentenced. Therefore, the Court finds that Beamon's Section 1983 claims against Officer Pacheco (in Counts 1 and 2) are not precluded under the *Heck* doctrine, and those claims will be reviewed below on the merits.

## II. Plaintiffs' Section 1983 claims against Officer Pacheco in her individual capacity (Counts 1 and 2)

Defendants seek summary judgment on Plaintiffs' Section 1983 claims on the basis that she committed no constitutional violations because (according to her) (1) Officer Pacheco had probable cause to search (and necessarily by extension of searching, detain) Plaintiffs and Beamon's car and (2) Officer Pacheco was permitted to perform a search of Patterson's person, because marijuana was found in Beamon's car and another officer believed Patterson had concealed something between her legs.[14] (Doc. No. 50-1 at 10, 11, 14). Defendants essentially

---

[13] Confusingly, the state court's order used the following language: "[a] plea of guilty has been accepted but adjudication of guilt is withheld." At the federal level, the undersigned—and other jurists—interpret *acceptance of* a plea of guilty as effectuating a conviction. Here, the state court—despite its express language quoted above—appears in substance not to have actually "accepted" Beamon's plea of guilty, when at most the state court held Beamon's plea of guilty in abeyance pending a determination of whether Beamon thereafter satisfied certain conditions (pursuant to his term of probation), in which case the plea of guilty would effectively be deemed withdrawn. The quoted language probably would have been more precise had it stated that a plea of guilty has been accepted *conditionally*, i.e., subject to being withdrawn if Beamon ultimately satisfied the applicable conditions.

[14] Defendants also seek summary judgment on Plaintiffs' Section 1983 claims on the basis that the initial encounter between Officer Pacheco and Plaintiffs was consensual (and thus did not involve a seizure at all). This appears to be in response to the Amended Complaint's implication that the initial encounter between Officer Pacheco and Plaintiffs was wrongful unless there was *reasonable suspicion*, (Doc. No. 17 at ¶ 52) ("There was no reason for the initial interaction between the officers and the Plaintiffs. Officers had no basis for reasonable suspicion that the Plaintiffs had committed, were committing or were about to commit a crime."), which would not be required unless the encounter resulted in a "seizure." Defendants argue that

note in passing, (Doc. No. 37-1 at 21), that if no constitutional violation occurred, then the Section 1983 claim fails not only for failure to satisfy the first element of a Section 1983 claim, but also that Officer Pacheco enjoys qualified immunity. Notably, for whatever reason, Defendants do not make the easier argument for qualified immunity, i.e., that even if there was a violation of Plaintiffs' constitutional rights, such right was not "clearly established" at the time of the

---

the initial encounter between Officer Pacheco and Plaintiffs did *not* result in a seizure and thus did not trigger Fourth Amendment scrutiny. *United States v. Moreno-Martinez*, 467 F. App'x 492, 492–93 (6th Cir. 2012) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). *See also United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (finding that police officer does not need probable cause, or even reasonable suspicion, before approaching a citizen to pose some questions or to ask for identification). The Court agrees that a reasonable jury, based on the undisputed facts, could not find that the initial encounter resulted in anything rising to the level of a seizure.

"[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439. "A seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Id.* "[As] long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual . . . ." *Id.* (internal quotation marks and citation omitted). If and when (if ever) the encounter escalates to the point where the individual is "seized," then the officer must have reasonable suspicion or probable cause to satisfy the Fourth Amendment. *Campbell*, 486 F.3d at 954.

The "seemingly routine approach of the police" is a "traditional hallmark of a police-citizen consensual encounter." *United States v. Jones*, 678 F.3d 293, 300 (4th Cir. 2012). A "routine" encounter is one in which an officer "merely approach[es] an individual on the street or in another public place" and "ask[s] him if he is willing to answer some questions" or "put[s] questions to him if the person is willing to listen." *Id.* (quoting *Bostick*, 501 U.S. at 434). This kind of "routine" encounter is distinguishable from an encounter "targeted at" a particular person suspected of wrongdoing. *Jones*, 678 F.3d at 301. In determining whether a seizure occurred, a court may take into account an "officer's tone of voice and general demeanor." *Weaver*, 282 F.3d at 310. In addition, a court may consider "whether [officers] treated" a person "as though they suspected him of 'illegal activity rather than treating the encounter as 'routine in nature.'" *Jones*, 678 F.3d at 300 (quoting *Gray*, 883 F.2d at 322–23).

The undisputed facts support that Officer Pacheco's approach was routine: Officer Pacheco approached Beamon's parked car outside his apartment complex just before 3 a.m.; Officer Pacheco shone her flashlight to see both Plaintiffs were sitting in Beamon's car, and then tapped on the window of the rear passenger door; and after Patterson opened the door, Officer Pacheco initiated a conversation by asking "how are you," "what are you guys doing," and "do you live here", and then stated, "[w]e're in the area looking for like vehicle burglaries and stuff like that okay, because we've had a bunch of them here recently." (Doc. No. 42-1 at ¶¶ 3, 5, 7, 9). Officer Pacheco merely approached Beamon's car, which was one of many in an open parking lot, to put questions to him about criminal activity reported in the area. Beamon even began to converse with Officer Pacheco in rather casual fashion, mentioning that he had heard from his landlord that car burglaries had happened in the area. (Pacheco Body Camera 2:47:42-2:48:55). The Court is satisfied that Officer Pacheco's initial contact with Plaintiffs was a consensual encounter rather than an encounter involving a seizure.

violation.[15] And since Defendants forwent arguing the easier path to qualified immunity, the Court

will not assess whether Defendants have this path to qualified immunity. Plaintiffs' only argument

in response is that Defendants lacked probable cause to stop and interrogate Plaintiffs. (Doc. No.

42 at 8).[16]

---

[15] Qualified immunity protects government officials from civil suits for damages, so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 695 (6th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court is required to employ a two-part test to determine whether a government official is entitled to qualified immunity. *Id.* at 695. It must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that constitutional right was clearly established. *Wright v. City of Euclid,* 962 F.3d 852, 864 (6th Cir. 2020). Courts are permitted to address these two questions in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If either question is answered in the negative, then the official is entitled to qualified immunity. *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021). Thus, a defendant need not show that there was no constitutional violation, as long as (s)he can show that there was no violation of a "clearly established" constitutional right. Notably, in this context, to say that a constitutional right is clearly established is to say that right was "so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct," *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) —which is to say, the official would have understood "that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (internal quotation marks omitted).

[16] This bald assertion (of a lack of probable cause or reasonable suspicion) is based solely on the allegation that Officer Pacheco and the other officers detected the odor of marijuana as pretext for racial animus—i.e., unlawfully searched and seized Plaintiffs and subsequently arrested Beamon *because* Plaintiffs are African Americans. (Doc. No. 42 at 9-10). But to assert a constitutional claim based on disparate racial treatment, Plaintiffs would have to have brought an equal protection claim under the Fourteenth Amendment, and they did not; instead, their constitutional claims were all grounded solely in the Fourth Amendment—which protects against unreasonable searches and seizures, not disparate racial (or any other class-based) treatment.

Even if Plaintiffs could bring a race-based claim under the Fourth Amendment, they have no evidence to support that claim. Via Defendants' Fact No. 31, Defendants posit that Plaintiffs "*admit* that they have no evidence to support such allegations, and their sole basis for making such allegations is that they are both African American." (*Id.*) (citing Doc. No. 42-1 at ¶ 31) (emphasis added). This is not a fully accurate reflection of Plaintiffs' response to Defendants' Fact No. 31, which was in pertinent part as follows:

> **Disputed**. Defendants are aware this is disputed. A simple review of the deposition transcripts and the complaint show this is disputed. Mr. Beamon indicated in his deposition very clearly that it was his belief that the officers acted from a position of racial bias.

(Doc. No. 42-1 at ¶ 31) (emphasis in original). So, Plaintiffs dispute that they have no evidence to support the notion that the subject incident was a "racially motivated investigation" and a purported example of "racial profiling" solely based on their being African American. However, the dispute is not *genuine*, because Plaintiffs have put forth no evidence to support that dispute. Plaintiffs cite only Beamon's deposition testimony that he *believes* the officers acted from a position of racial bias (*id.*), but Beamon's

A. <u>Search and Seizure</u>

A Section 1983 claim provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 (1979). A plaintiff bringing a Section 1983

---

mere subjective (and self-serving) belief is not competent evidence of the truth of that belief. Beamon's testimony, as well as Patterson's testimony, actually supports Defendants' contention that Plaintiffs have no evidence of racial profiling or racially motivated investigation:

> [From Beamon's deposition:]
> Q: "What facts or information do you have to believe that you were racially profiled?"
>
> A: "We were out there being black in the car. That's all of it."
>
> …
>
> Q: "[O]ther than just the fact that you are black African American. Beyond that, do you have any proof that that's why the officers came to your vehicle that night?"
>
> A: "No."
>
> …
>
> Q: "You don't have any information that this officer approached you because you were black or charged you because you were black, do you?"
>
> A: "No."
>
> [From Patterson's deposition:]
>
> Q: "What facts do you have to support the claim that you were racially profiled?"
>
> A: "We're two black people sitting in the car."
>
> …
>
> Q: "Has anybody come forward later on and told you that they have any information regarding what the officers did that night that they were targeting you and Mr. Beamon because you were black?"
>
> A: "No."

(Doc. No. 42-1 at ¶ 31) (reformatted and internal citations to deposition transcript omitted). Not only would the above testimony likely persuade a reasonable jury on Defendants' contention that Plaintiffs lack evidence to support that they were racially profiled, but Plaintiffs failed to rebut any of this testimony in their Response (e.g. citing other statements in deposition transcripts or other evidence in the record). Therefore, assuming *arguendo* that Plaintiffs could even bring Section 1983 claim based on race under the Fourth Amendment, Plaintiffs have failed to meet their burden under the summary judgment standard.

claim must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Dominguez v. Corr. Med. Servs.*, 55 5 F.3d 543, 549 (6th Cir. 2009). Plaintiffs have asserted a claim under 42 U.S.C. § 1983 against Officer Pacheco, claiming that Officer Pacheco violated their federal constitutional rights— namely, their right to be free of unreasonable searches and seizures under the Fourth Amendment. As alleged, Plaintiffs are essentially challenging the constitutionality of the encounter initiated by Officer Pacheco that turned into a so-called *Terry* stop—a particular kind of "seizure" within the meaning of the Fourth Amendment—conducted primarily by Officer Pacheco but with the assistance of other Clarksville police officers.

The Fourth Amendment generally requires a warrant for a search, but that general requirement is subject to various particular exceptions. *See Kentucky v. King*, 563 U.S. 452, 459 (2011). One such exception is the so-called "automobile exception." "The automobile exception allows a warrantless search of an automobile if officers have probable cause to believe the vehicle contains evidence of a crime." *United States v. Galaviz*, 645 F.3d 347, 357 (6th Cir. 2011).

An odor of marijuana coming from a vehicle gives an officer probable cause to search the vehicle without a search warrant. *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008) (noting that the Sixth Circuit has been "consistent[ ] in holding that the detection of a narcotic's odor, by itself, is sufficient to provide probable cause to conduct a lawful search of a vehicle."). Regarding searching *individuals*, the Court notes that one kind of "search" within the meaning of the Fourth Amendment—a limited search—is a "protective search." The Sixth Circuit recently discussed the allowable scope of a protective search:

> During *Terry* stops, police officers may take reasonable steps to protect themselves and others from physical harm. [*Terry*, 329 U.S.] at 23–24, 88 S. Ct. 1868. For example, officers can perform protective searches for weapons if they reasonably suspect that the stopped individual is "armed and dangerous." *Id.* at 26–

27, 88 S. Ct. 1868. Sometimes, the protective search is limited to a pat-down of the suspect's outer clothing. *See id.* at 27, 29–30, 88 S. Ct. 1868. But in *Michigan v. Long*, the Supreme Court recognized that more expansive protective searches can be appropriate in the "especially hazardous" context of *Terry* stops involving automobiles. 463 U.S. 1032, 1049, 103 S. Ct. 3469, 77 L.Ed.2d 1201 (1983). Officers with the requisite reasonable suspicion may search the passenger compartment of a suspect's vehicle—including closed compartments—for accessible weapons. *Id.* at 1048–50, 103 S. Ct. 3469. That's true even if the suspect isn't inside the vehicle at the time. *Id.* at 1051–52, 103 S. Ct. 3469.

*United States v. McMullen*, 103 F.4th 1225, 1229 (6th Cir. 2024). It is fair to say that generally (and not just "sometimes") a protective search is limited to a pat-down of the subjects outer clothing (which is referred to herein as a "pat-down" or "pat-down search" for short). But when the *Terry* stop involves a "roadside encounter," the protective search may include a "search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden . . . if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer to believe that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long*, 463 U.S. at 1033 (1983).

"Police officers 'may briefly stop an individual for investigation if they have "reasonable suspicion" that the person has committed a crime.'" *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (quoting *Houston v. Clark County Sheriff Deputy John Does 1–5*, 174 F.3d 809, 813 (6th Cir. 1999)). This kind of investigatory stop is known as a "*Terry*" stop based on the landmark Supreme Court case of *Terry v. Ohio*, 392 U.S. 1 (1968), which "held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, (2000) (quoting *Terry*, 392 U.S. at 30). *See also United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022).

A Terry stop may not be excessively intrusive and must be reasonably related in scope and duration to the purposes of the investigation. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). "When establishing that a detention, which was not supported by probable cause, was reasonable, the government must demonstrate that the detention and investigative methods used were reasonable under the circumstances." *United States v. Jacob*, 377 F.3d 573, 578 (6th Cir. 2004) (internal quotation marks and citations omitted). The "scope of the intrusion permitted" in the course of a Terry stop "will vary . . . with the particular facts and circumstances of each case," but in all cases the "detention must be temporary and last no longer than is necessary" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

An officer may conduct a pat-down search of a lawfully detained individual to search *for weapons* if he or she has a *reasonable suspicion* that the individual is armed and dangerous. *Terry*, 392 U.S. at 27. In the Sixth Circuit, "where an officer suspects drug activity, he can reasonably infer that the suspect is armed and dangerous." *United States v. Akinyemi*, 101 F. App'x 109, 111 (6th Cir. 2004). *See also Jacob*, 377 F.3d at 579 ("[O]fficers who stop a person who is reasonably suspected of carrying drugs are entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions, and to take reasonable measures to protect themselves.") (internal quotation marks omitted); *United States v. Noble*, 364 F. App'x 961, 965 (6th Cir. 2010) ("the officers had a reasonable belief that Noble may be armed because of their suspicion that he was involved in illegal drug activity, which was supported by the odor of marijuana emanating from Noble's vehicle and Noble's lack of response when asked if he had a weapon, along with the officers' experience that persons engaged in drug activity are often

armed."); *United States v. Borne*, 239 F. App'x 185, 186-87 (6th Cir. 2007) (affirming decision below that a pat-down was justified, based on the fact that the frisking officer testified that he smelled methamphetamine and that methamphetamine traffickers in the area were known to go armed); *United States v. Thomas,* No. 97–4827, 1998 WL 852951, at *6 (4th Cir. 1998) (smell of marijuana, the defendant's actions prior to approaching checkpoint, and the officer's experience that weapons frequently accompany drugs, all provided justification for officer to conduct protective search). *Cf. United States v. Colbert*, 54 F.4th 521, 527 (7th Cir. 2022) (upholding district court's conclusion "that the odor of marijuana on [the defendant's] person and in his vehicle contributed to a reasonable suspicion that [the defendant] was armed and dangerous, justifying a *Terry* frisk"). Notably and unsurprisingly, the smell of illegal drugs emanating from a vehicle  can contribute to a reasonable suspicion that a passenger (and not just the driver) was armed and dangerous. *See United States v. Brown*, 578 F. App'x 195, 197 (4th Cir. 2014).

"To justify a pat-down search during a *Terry* stop[,] the Fourth Amendment requires a reasonable belief that the suspect is armed and dangerous; likewise, for the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005); *see also Houston v. Doe*, 174 F.3d 809, 815 (6th Cir. 1999). As for the use of handcuffs, it is appropriate for an officer to handcuff an individual for safety purposes even if the individual is being merely detained and not (yet) arrested. *Hamilton v. Franklin*, *Tennessee*, 608 F. Supp. 3d 599, 612 (M.D. Tenn. 2022) (Richardson, J.) (citing *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007) (citing *Houston v. Does*, 174 F.3d 809, 814 (6th Cir. 1999))) (police responding to an anonymous

tip of crime occurring in a motel room did not violate the Fourth Amendment by handcuffing one

of the individuals in the room based on his nervous behavior).

    B. <u>Analysis</u>

    Various relevant material facts are undisputed. Among them are that: just before 3 a.m.,

Officer Pacheco approached Beamon's parked car outside his apartment complex; that Officer

Pacheco shone her flashlight to see both Plaintiffs were sitting in Beamon's car; Officer Pacheco

tapped on the window of the rear passenger door and Patterson opened the door; and after Patterson

opened the door, Officer Pacheco stated, "[w]e're in the area looking for like vehicle burglaries

and stuff like that okay, because we've had a bunch of them here recently." (Doc. No. 42-1 at ¶¶

3, 5, 7, 9). It is also undisputed that once Officer Pacheco opened the door, she and Officer Aragon

detected an odor of marijuana emitting from the car. [17] (Doc. Nos. 50-1 at 10; 42-1 at ¶ 7).

---

[17] Plaintiffs dispute that Officer Pacheco had probable cause to search the vehicle and the person of Patterson, by arguing that Officer Pacheco, as a human being of ordinary smell, could not differentiate between the smell of over-the-counter Delta 8/9 products and marijuana products. (Doc. No. 42-1 at 7). Patterson further argues that to accept that Officer Pacheco could identify marijuana via her sense of smell the factfinder "would have to accept that Officer Pacheco smelled marijuana while the two Plaintiffs contend none could be smelled, and…that if Officer Pacheco did smell something (which she did not) that she has a better nose than the TBI's trained drug sniffing dogs" (Doc. No. 42 at 9). The Court disagrees.

  As indicated above, it is well settled by the Sixth Circuit that "[an officer's] smelling the marijuana [during a vehicle stop] constituted probable cause to believe that there was marijuana in the vehicle. Once this probable cause existed, a search warrant was not necessary." *United States v. Littleton*, 15 F. App'x 189, 193 (6th Cir. 2001) (quoting *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993)). *See also United States v. Avant*, 650 F. App'x 890, 892 (6th Cir. 2016) (finding that the defendants cited no authority that requires the use of a canine unit to detect the presence of narcotics when an officer has already smelled narcotics, and that "the district court did not clearly err in finding that the officers testified credibly that they smelled marijuana. Nor did the district Court err in concluding that the smell of marijuana provided probable cause to search the Buick without a warrant."). More to the point, Plaintiffs' argument flies in the face of Sixth Circuit's recent discussion in *McCallister*:

> Nor is it compelling that the marijuana odor could have been a legal substance, like hemp, instead of illegal marijuana. Reasonable suspicion, remember, does not require proof that the suspect committed a crime. And as McCallister concedes [that] the odors of hemp (legal) and marijuana (illegal) are indistinguishable, the odor suggested at least a moderate chance that McCallister smoked marijuana.

Given these undisputed facts, Defendants argue that Officer Pacheco and the other officers had probable cause to search Beamon's car without a warrant upon detecting the odor of marijuana. (Doc. No. 50-1 at 9) (citing *United States v. Brooks*, 987 F.3d 593, 599 (6th Cir. 2021) (collecting cases and observing, "[O]ur court has long held *that officers have the required probable cause when they detect the odor of illegal marijuana coming from the vehicle*.") (emphasis added)). Defendants then argue that the undisputed facts support the notion that Officer Pacheco's first search of Patterson ("First Search") was a routine pat-down—a thorough search of the suspect's "arms and armpits, waistline and back, the groin area and around the testicles, and the entire surfaces of the legs down to the feet," (Doc. No. 50-1 at 14) (quoting *Terry*, 392 U.S. at 17 n.13 (1968))—which an officer may conduct to search for weapons on a lawfully detained individual if the officer has a reasonable suspicion that the individual is armed and dangerous. Defendants also argue that the undisputed facts show that Beamon consented to a search of his person. (Doc. No. 42-1 at ¶ 10).

In response, Plaintiffs contend that Officer Pacheco and the other officers lacked probable cause to search Plaintiffs' persons and Beamon's vehicle. (Doc. No. 42 at 9). Specifically, Plaintiffs argue that the detection of the odor of marijuana should not authorize Officer Pacheco or the other officers to conduct a "dragnet-like search" of Beamon's car or Plaintiffs' persons, and that to allow this search, the Court would have to take a logical leap to find that Officer Pacheco smelled marijuana upon opening the car door even though (according to Officer Pacheco's own testimony) neither Plaintiff smoked prior her initial encounter with them and that the marijuana

*McCallister*, 39 F.4th at 375 (citation omitted). Therefore, Plaintiffs' argument that Officer Pacheco lacks the ability to distinguish between the smell of Delta 8/9 products and marijuana products is irrelevant to whether Officer Pacheco believed that she had detected an order of marijuana coming from Beamon's car. Accordingly, the Court will not consider Plaintiffs' Delta 8/9 theory in reviewing the Motion.

was found in a sealed bag in the trunk of Beamon's car. (*Id.*). Moreover, Plaintiffs challenge the Clarksville officers' right to search Beamon's car when he did not consent to a search of his car. (Doc. No. 42 at 5, 10).

The Court finds that no such logical leap is necessary. This is in part because a marijuana smell obviously can emanate from a car even if no unsealed marijuana is present in the car at the time and even if no one smoked marijuana in the car within the last few minutes. Defendants have made an evidentiary showing that Officer Pacheco did smell marijuana, and yet Plaintiffs have pointed to nothing in the record to support that Officer Pacheco could not smell marijuana when opening the car door. Instead, despite their contention about how difficult it would be for Officer Pacheco to smell marijuana, Plaintiffs do not dispute that Officer Pacheco told Beamon that she smelled an odor of marijuana coming from his vehicle and that Beamon—rather than denying that the vehicle smelled like marijuana and/or appearing surprised or perplexed by Officer Pacheco's statement—offered an explanation as to why the vehicle did smell like marijuana.[18] (Doc. No. 42-1 at ¶ 11) ("Mr. Beamon indicated that it had been at least a week maybe a month since someone may have smoked in the vehicle.").

In the Court's view, Plaintiffs wholly failed to respond to Defendants' argument as to why Officer Pacheco is entitled to summary judgment on Beamon's claims asserting unreasonable search *and* seizure (Count 1a) and on Patterson's claim asserting unreasonable seizure (part of

---

[18] Plaintiffs also do not dispute Defendants' Facts Nos. 37 and 38, which state in pertinent part that "[w]hile detained inside Officer Pacheco's patrol car, Ms. Patterson made the following statement to Mr. Beamon: 'I should have just let you use my body spray. Then, they would have never smelled it,'" to which Mr. Beamon replied: "Damn, I didn't even think of that [expletive]." But these statements arose after the search of Beamon's car and Plaintiffs' persons concluded, so these statements bear no consequence in the determination of whether Officer Pacheco and other officers had probable cause to search Beamon's car and Plaintiffs' persons. They do, however, weaken any argument by Plaintiffs now that Officer Pacheco could smell marijuana coming from the car.

Count 1b) and claim asserting false arrest/false imprisonment (Count 2b).[19] Therefore, Plaintiffs have failed to carry their burden on these claims, and Defendants are entitled to summary judgment on these claims.

The same cannot be said for Beamon's claim asserting false arrest/false imprisonment (Count 2a) or Patterson's claim asserting unreasonable *search* (part of Count 1b). Banking on Beamon's claims being barred under the *Heck* doctrine,[20] Defendants offer no alternative argument as to why Beamon's claim for false arrest/false imprisonment does not survive summary judgment. Unfortunately for Defendants, as discussed above, Beamon's section 1983 claims are *not* barred by the *Heck* doctrine. Absent another asserted basis for summary judgment as to Beamon's claim for false arrest/false imprisonment (Count 2a), the Court will **deny** the Motion as to that claim.

As for Patterson's claim of unreasonable search of her person (part of Count 1b), as discussed above, a police officer may take reasonable steps to protect themselves and others from physical harm, *Terry*, 329 U.S. at 23–24, by performing a pat-down search for weapons if they

---

[19] Whether described as an "unreasonable . . . seizure," a "false arrest," or a "false imprisonment," Patterson's claims in Counts 1b and 2b of the Amended Complaint are based on the same underlying allegation: that Officer Pacheco seized, or detained, Patterson without probable cause (and thus unreasonably) in violation of her Fourth and Amendment rights. (Doc. No. 17 at ¶¶ 52, 53, 64, 69, 72). Patterson's false arrest/imprisonment claim is redundant of her unreasonable seizure claim because "[a]ctions under [§ 1983] based upon claims of false arrest or false imprisonment are properly analyzed as unreasonable seizures under the Fourth Amendment." *Stacy v. Clarksville Police Dep't*, 771 F. Supp. 3d 1024, 1036 (M.D. Tenn. 2025) (Crenshaw, J.) (citing *McPhearson v. Anderson*, 874 F. Supp. 2d 573, 580 (E.D. Va. 2012) (citation omitted)). *See also Myers v. Koopman,* 738 F.3d 1190, 1194 (10th Cir. 2013), *as amended on denial of reh'g* (Jan. 8, 2014) ("Unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims.") (citing *Wallace v. Kato*, 549 U.S. 384, 389 (2007) (concluding that false imprisonment was the proper analogy where defendants did not have a warrant for the plaintiff's arrest and thus detention occurred without legal process). Accordingly, the Court will analyze Counts 1b and 2b together as if they were the same claim for an unreasonable seizure, and as just discussed above, Patterson's unreasonable seizure claim will not survive summary judgment.

[20] Defendants via their Motion state that "as argued later in this Memorandum, *Heck v. Humphrey* bars any Section 1983 claim that Mr. Beamon pursues (to include false arrest/false imprisonment)." (Doc. No. 50-1 at 26).

reasonably suspect that the stopped individual is "armed and dangerous," (*id*. at 26–27), and "where an officer suspects drug activity, he can reasonably infer that the suspect is armed and dangerous" (*United States*, 101 F. App'x at 111). It is undisputed that Officer Pacheco detected the smell of marijuana emitting from Beamon's car, which provided a legal basis for Officer Pacheco to perform a protective pat-down search of Patterson's person—the First Search.

It is also undisputed that the search of Beamon's car, which proceeded the Second Search, yielded two bags of marijuana (having a total preliminary weight of 54 grams), scales, a baggy, and cash. (Doc. No. 42-1 at ¶ 15). From the body camera footage, it is clear that when Patterson exits Beamon's car, her dress is pushed up to her hips; the viewer can even see a glimpse of her underwear. (Pacheco Body Camera at 2:53:25). Though it is dubious that Officer Aragon could have witnessed Patterson exiting the car and perceived that she was holding something between her legs—especially when her hands can be clearly seen at her sides, pulling down her dress—Plaintiffs concede as undisputed that "Officer Aragon advised Officer Pacheco that he had seen something between Ms. Patterson's legs when she had exited the vehicle."[21] (Doc. No. 42-1 at ¶ 16). Moreover, Plaintiffs do not dispute that Officer Aragon sincerely suspected that Patterson

---

[21] Plaintiffs' exact response to Defendants' Facts concerning Officer Aragon's statement was as follows:

> **Undisputed subject to clarification.** At approximately the 8:15/20 mark during Officer Pacheco's Body Worn Camera footage, another male officer tells Officer Pacheco that he thought he might have seen something between Ms. Patterson's legs when she exited the vehicle. Of course there was no contraband or anything between Ms. Patterson's legs other than her vagina. The had already been unlawfully searched once and was subjected to another unlawful search that included an illegal body cavity search. The only thing that was in Ms. Patterson's vagina and between her legs ended up being the hand/fingers of Officer Pacheco. [Officer Lyssed Pacheco's Body Worn Camera at approximately the 8:15/20 mark; Deposition of Cassandra Patterson, p. 158: 5-7; The Officers Body Worn Camera Footage, generally]

(Doc. No. 42-1 at ¶ 16) (emphasis in original). In their response, Plaintiffs disagree that Patterson had anything between her legs, but they do not dispute that Officer Aragon made a statement to Officer Pacheco about Patterson having something between her legs. Likewise, Plaintiffs failed to make any argument in their Response to challenge Officer Aragon's statement.

could be holding something between her legs as she exited Beamon's car. Even more to the point, Officer Aragon did advise Officer Pacheco that he saw something between Patterson's legs, and Officer Pacheco apparently believed Officer Aragan; this is significant in the analysis because the assessment of an officer's liability under Section 1983 for (allegedly) violating the Fourth Amendment is based on *the information known to the officer at the time. Grant v. Wilson*, No. 21-5642, 2022 WL 3500190, at *7 (6th Cir. Aug. 18, 2022) (assessing "[f]rom the information known to" the defendant officers whether they were liable under Section 1983 for an allegedly unconstitutional warrantless entry into a house); *Amis v. Twardesky,* 637 F. App'x 859, 864 (6th Cir. 2015) (focusing on whether "a reasonable jury could find that *the information known to defendants* when they arrested [the plaintiff] fell short of probable cause"). The information known by Officer Pacheco at the time includes that an officer reported something was between Patterson's legs upon exiting Beamon's car. Therefore, Officer Pacheco has a legal basis to perform a protective pat-down search of Patterson's person—the Second Search.

What remains in dispute is the *degree* to which Patterson's body was searched, and whether the two searches of her person went beyond the permissible bounds of a pat-down search (i.e., the bounds of what is permitted based solely on reasonable suspicion that the person is armed and dangerous, which is all Officer Pacheco had inasmuch as she lacked probable cause to search or to arrest and thus authorize a search incident to a lawful arrest). Defendants' argue that Officer Pacheco's searches of Patterson's person are justified as pat-downs warranted by reasonable suspicion that she was armed and dangerous and that the pat-down did not exceed the proper scope of a pat-down. (Doc. No. 50 at 12-13). Plaintiffs vehemently contend via their Response that *both* searches of Patterson's person were unconstitutional and that a reasonable jury could find that "the consistent testimony of [] Patterson as to the intrusiveness and invasiveness of the searches of

[Officer] Pacheco, including that [Officer] Pacheco invaded and digitally penetrated her vagina." (Doc. No. 42 at 15).

But Patterson, during her deposition, abandoned her allegation that she was digitally penetrated during the First Search. (Doc. No. 41-1 at ¶ 24). With that allegation retracted and after reviewing the body camera footage of the First Search (which shows Officer Pacheco conducting a pat-down search of Patterson's outer clothing, including the typical areas of a pat-down—i.e., "arms and armpits, waistline and back, the groin area and around the testicles, and the entire surfaces of the legs down to the feet" (quoting *Terry*, 392 U.S. at 17 n.13 (1968)—that lasted no more than fifteen (15) seconds (Pacheco Body Camera, 2:53:52-2:54:07)), a reasonable jury could not find that the First Search was excessive or intrusive.

Therefore, the Court will **grant** the Motion as to Patterson's claim for unreasonable search (part of Count 1b) as it relates to the First Search in particular.

The body camera footage submitted by Defendants reveals even more as to what happened during the Second Search: from the conclusion of the First Search until the start of the Second Search, Patterson (handcuffed) either sat on the ground or stood near Officer Mazuera; Officer Pacheco wore gloves for the entirety of the Second Search and searched over Patterson's dress for the upper half of her body; the Second Search lasted no more than twenty-two (22) seconds; and Patterson, who albeit is visibly annoyed during the search, makes no verbal comment about being violated or vaginally penetrated by Officer Pacheco's finger during the search. (Pacheco Body Camera, 3:16:16-3:16:38; Mazuera Body Camera, 2:54:10-3:16:15, 3:16:16-3:16:38; Doc. No. 42-1 at ¶ 20).

The search of the upper half of Patterson's body is clearly seen in the body camera footage. It would be far-fetched, and thus a reasonable jury could not find upon viewing the body camera

footage, that Officer Pacheco fondled Patterson's breasts or manipulated her nipples during the Second Search. It remains unclear, however, what happened when Officer Pacheco searched the lower half of Patterson's body, as this portion of the body camera footage is not clearly recorded. Consequently, a reasonable jury could find that there is a genuine issue of fact as to what occurred when Officer Pacheco searched the lower half of Patterson's person.

Therefore, the Court will **deny** the Motion as to Patterson's claim for unreasonable search (part of Count 1b) with respect to the Second Search in particular.

## III. Patterson's state law claims of IIED and civil battery against Officer Pacheco (Counts 3 and 4)

Defendants assert that Officer Pacheco[22] enjoys qualified immunity from any liability regarding Patterson's state-law claims of civil battery and IIED. (Doc. No. 50-1 at 26). Defendants argue that "Officer Pacheco not only enjoys federal qualified immunity from the Section 1983 claims against her…but she also enjoys state law qualified immunity from the civil battery claim (and, for that matter, the intentional infliction of emotional distress claims)…." (*Id*. at 25-26).

Qualified immunity protects government officials from civil suits for damages, so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 695 (6th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The doctrine protects all but the plainly incompetent or those who knowingly violate the law." *Hux v. Williams*, 751 F. Supp. 3d 885, 892 (E.D. Tenn. 2024) (internal quotation marks omitted) (quoting *Humphrey v.*

---

[22] Defendants also argue that because Patterson's Section 1983 claims and civil battery claim all arise from the same set of facts and "because the gravamen of [those] claims sound in a purported violation of civil rights," the Governmental Tort Liability Act's "civil rights" exception insulates the City of Clarksville from those claims. (Doc. No. 50-1 at 27). In its prior memorandum opinion (Doc. No. 52), the Court declined to exercise supplemental jurisdiction over the only state-law claim (civil battery claim (Count 4)) against the City of Clarksville, and therefore, the Court herein will not discuss any argument regarding state-law claims against the City of Clarksville.

*Mabry*, 482 F.3d 840, 847 (6th Cir. 2007)). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

To determine whether an official is entitled to qualified immunity on a Section 1983 claim, the Court is required to consider: whether the official's conduct violated a constitutional right, and whether that constitutional right was clearly established. *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 864 (6th Cir. 2020). Courts are permitted to address these two questions in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If either question is answered in the negative, then the official is entitled to qualified immunity. *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021).

As Defendants point out in their Memorandum, Tennessee recognizes a state-law qualified immunity defense to state tort actions against government officers for their discretionary functions. (Doc. No. 50-1 at 25) (quoting *Hammond-Beville v. Landis*, 2022 U.S. App. LEXIS 8592, 2022 WL 910569, at *5 (6th Cir. Mar. 29, 2022) (citing *Youngblood v. Clepper*, 856 S.W.2d 405, 405 (Tenn. Ct. App. 1993)). However, whereas the "relevant question [regarding qualified immunity] in a § 1983 suit is whether the defendant violated clearly established *federal* law," the relevant question regarding qualified immunity in a tort action under Tennessee law is "whether defendants committed a clearly established state tort violation." *Allen v. Lo*, 751 F. Supp. 3d 863, 881 (M.D. Tenn. 2024).

Despite acknowledging this difference (Doc. No. 50-1 at 25), Defendants do two things that make little sense in light of such acknowledgment. First, they forgo any attempt to showing that Patterson cannot establish what she needs to establish to avoid qualified immunity on her

state-law claims, i.e., that Officer Pacheco committed "a clearly established state tort violation," which in this case would be "civil battery."

Second, they instead contend—contrary to their acknowledgment of how the analysis in the federal (Section 1983) context is different from the analysis in the state context—that "the analysis for the Section 1983 claims applie[s] equally to the state law battery claim." (Doc. No. 50-1 at 25). For this contention, Defendants cite two cases—*Allen* and *Hux v. Williams*, 751 F. Supp. 3d 885, 898 (E.D. Tenn. 2024)—each of which involved the specific overlap between civil battery (the state-law claim) *and excessive force in particular* (the Section 1983 claim). *Cf Hux*, 751 F. Supp. 3d at 898 (finding that "[b]ecause the plaintiff had grounds for an excessive force claim against the police officer defendant, she additionally set forth adequate grounds…for assault and battery under Tennessee law.") (internal quotation marks omitted); *Allen*, 751 F. Supp. 3d at 881 (finding that "[w]here a plaintiff asserts a battery claim under Tennessee law that arises out of the same use of force as [a] § 1983 excessive-force claim, the analysis is the same for both causes of action.") (quoting *Griffin v. Hardrick*, 604 F.3d 949, 956 (6th Cir. 2010)). To say that the analysis for a battery claim under Tennessee law is effectively the same as the analysis for an excessive-force claim makes sense, given the overlap between (a) what is required to show battery under Tennessee law and (b) what is required to show *excessive force* under Section 1983. But there is no such overlap between (a) a battery claim or IIED claim under Tennessee law and (b) a claim of *unreasonable search or unreasonable seizure* under Section 1983, and so these cases do not support concluding that the qualified-immunity analysis is the same for each of these kinds of claims.

Relying on their incorrect contention that Officer Pacheco automatically enjoys qualified immunity on the state-law battery and IIED claims if she enjoys qualified immunity as to the

Section 1983 claims for unreasonable search and seizure, Defendants—citing no evidence in the record—argue that the First Search and the Second Search were "objectively reasonable and did not violate the Fourth Amendment [and so]. . . Ms. Patterson's state law battery claim (Count 4) against Officer Pacheco fails, as a matter of law." (Doc. No. 50-1 at 25-26). As the moving party, Defendants must do more than make bald assertions; they must—by pointing to materials of record or otherwise—*show* (presumptively, i.e., subject to the plaintiff's response) that Plaintiffs cannot prevail. *See* Fed. R. Civ. P. 56(c)(1). Put another way, even if Defendants' contention had been correct, it would do them no good because they simply have not met their initial burden[23] of *showing* that Officer Pacheco enjoys qualified immunity as to the Section 1983 claims either because she did not commit violations of Patterson's Fourth Amendment rights or because a reasonable officer in her position would not have known that these amounted to such violations.

Without a proper showing under Rule 56(c)(1), Defendants have failed to satisfy their burden. As such, the Court must **deny** the Motion as to Patterson's state-law claim for civil battery (Count 4).

On Patterson's IIED claim (Count 3), Defendants did offer an alternative argument to qualified immunity, namely that Patterson cannot establish either the first element (that outrageous conduct occurred) or the third element (that "serious mental injury" was sustained) of an IIED claim. (Doc. No. 50-1 at 41).

---

[23] The undersigned previously has held that "a defendant who moves for summary judgment relying on a qualified-immunity defense has the initial burden to come forward with facts suggesting that the official acted within his or her discretionary authority when the alleged violation took place." *Alford v. Deffendol*, No. 3:23-CV-00272, 2025 WL 297665, at *5 (M.D. Tenn. Jan. 24, 2025) (citing *Gardenhire*, 205 F.3d at 311). It seems clear that a defendant-movant can do so either by showing that he or she committed no constitutional violation or at least that a reasonable officer in his or her position would not have realized that her conduct amounted to a constitutional violation. Accordingly, the Court places this initial burden here upon Defendants, as the summary judgment movants relying on qualified immunity.

To establish a claim for IIED under Tennessee law, a plaintiff must show that (1) the defendant acted either intentionally or recklessly in a manner (2) so outrageous that civilized society will not tolerate, and that (3) the conduct resulted in the plaintiff's serious mental injury. *Doe v. Vanderbilt Univ.*, 2019 U.S. Dist. LEXIS 173269, \*53 (M.D. Tenn. 2019) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)); *see also Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012), *abrogated on different grounds by, Youree v. Recovery House of E. Tennessee, LLC*, 705 S.W.3d 193 (Tenn. 2025). "To say that Tennessee courts narrowly define 'outrageous conduct' would be something of an understatement." *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 903 (M.D. Tenn. 2018). The conduct must be "atrocious," "utterly intolerable," and "beyond all bounds of decency." *Goldfarb v. Baker*, 547 S.W.2d 567, 569 (Tenn. 1977). As the Tennessee courts have explained:

> In describing these elements, we have emphasized that it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress. A plaintiff must in addition show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004) (internal citations and quotation marks omitted) (emphasis added); *see also* Restatement (Second) of Torts § 46 cmt. d, at 73 (1965); *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) (discussing the standard under identical Ohio law). It is clear from the above explanation that (a) the standard is not whether an aggrieved person (such as Patterson here) subjectively considers another's actions to have been so outrageous, but whether a civilized society (objectively) would so find, and (b) a plaintiff must prove that the conduct is outrageous in character, and not just in motive. *Doe*, 334 F. Supp. 3d at 903. Intentional and reckless conduct can form the basis of claims for IIED, and therefore, the alleged offender does not need to *intend* to cause emotional distress but rather merely must *act*

*recklessly* in doing so. *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 503 (Tenn. 2012) (quoting John J. Kircher, *The Four Faces of Tort Law: Liability for Emotional Harm*, 90 Marq. L. Rev. 789, 799 (2007)).

A plaintiff seeking damages for IIED must meet an "exacting standard." *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999). "Recovery for intentional infliction of emotional distress is limited to mental injury which is so severe that no reasonable person would be expected to endure it." *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003). The Tennessee Supreme Court had made it clear that there should not be recovery for "'every minor disturbance to a person's mental tranquility,' but only for serious or severe emotional injuries." *Rogers*, 367 S.W.3d at 208 (quoting *Barnhill v. Davis*, 300 N.W.2d 104, 107 (Iowa 1981)). There should be no recovery for fright or fear alone or "hurt feelings, trivial upsets, or temporary discomfort." *Id.* (quoting *Ramsey v. Beavers*, 931 S.W.2d 527, 532 (Tenn. 1996)). The aim of this rule is to avoid the judicial system being flooded with potentially fraudulent, manufactured, or overstated claims arising from the "transient and trivial" emotional distresses of daily life, recognizing that "[i]f the plaintiff is to recover every time that [his or] her feelings are hurt, we should all be in court twice a week." *Rogers*, 367 S.W.3d at 209 (quoting William L. Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich. L. Rev. 874, 877 (1939)). Rather, recovery should be only for "serious or severe emotional injuries which disable a reasonable, normally constituted person from coping adequately with the stress." *Ramsey*, 931 S.W.2d at 532. Given this high bar, "[a] trial court may reasonably dismiss this legal theory as a matter of law." *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010).

To assess whether a plaintiff has suffered a serious mental injury, courts may look to several factors, which include:

(1) Evidence of physiological manifestations of emotional distress, including but not limited to nausea, vomiting, headaches, severe weight loss or gain, and the like;

(2) Evidence of psychological manifestations of emotional distress, including but not limited to sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry;

(3) Evidence that the plaintiff sought medical treatment, was diagnosed with a medical or psychiatric disorder such as post-traumatic stress disorder, clinical depression, traumatically induced neurosis or psychosis, or phobia, and/or was prescribed medication;

(4) Evidence regarding the duration and intensity of the claimant's physiological symptoms, psychological symptoms, and medical treatment;

(5) Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and

(6) In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury.

*Rogers*, 367 S.W.3d at 209-210.

Defendants argue that Patterson "cannot prove the 'serious mental injury' element, as she cannot present evidence of physiological or psychological manifestations of emotional distress that are in any way significant–whether in duration or intensity–and she cannot present evidence of any impairment of her daily functioning attributable to the subject incident." (Doc. No. 50-1 at 42). Defendants hinge their argument on Patterson's deposition testimony: (i) that she was unable to leave her house for only one week as a result of the subject incident; (ii) that she discussed the subject incident once (but only once) during a counseling session that occurred two years after the subject incident; and (iii) that she was not prescribed any medication by her counselor/therapist. (Doc. No. 50-1 at 41). Defendants have carried their initial burden by showing via the record an absence of evidence to support that Patterson suffered a "serious mental injury," shifting the burden to Plaintiffs to present a *genuine* issue of *material* fact.

Patterson did not refute—must less address—Defendants' argument regarding "serious mental injury." Rather, she merely reasserted the argument from Plaintiffs' response (Doc. No. 23) to Defendants' motion to dismiss: that a body cavity search is outrageous conduct (Doc. No. 42-1 at 18-19). In failing to put forth any rebuttal argument (or point to evidence in the record) to show she did suffer a serious mental injury,[24] the Court finds that Patterson failed to meet her burden to survive summary judgment; thus, Defendants are entitled to summary judgment on it. *See Meecorp Capital Mkts. LLC*, 265 F. App'x at 158.

Therefore, the Court will **grant** the Motion as to Patterson's IIED claim (Count 3).

<u>CONCLUSION</u>

For the reasons stated herein, the Court will **GRANT** the Motion as to the following claims: (1) Beamon's Section 1983 claims for unreasonable search and seizure against Officer Pacheco (Count 1a); (2) Patterson's Section 1983 claims for unreasonable seizure and false arrest/false imprisonment against Officer Pacheco (part of Count 1b and Count 2b); (3) Patterson's Section 1983 claim for unreasonable search against Officer Pacheco, in relation to only the First Search (part of Count 1b); and (4) Patterson's state-law claim of IIED against Officer Pacheco (Count 3).

The Court will **DENY** the Motion as to the following claims: (1) Beamon's claim for false arrest/false imprisonment (Count 2a); (2) Patterson's Section 1983 claim for unreasonable search

---

[24] Plaintiffs have pointed to no evidence in the record showing any of the enumerated factors above to substantiate the presence a serious mental injury, such as physiological manifestations of emotional distress (nausea, vomiting, headaches, severe weight loss or gain, etc.) or psychological manifestations of emotional distress (sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry) or that Patterson was diagnosed with a medical or psychiatric disorder. Patterson merely disputes—via her responses to Defendants' Facts—the number of times she discussed the subject incident in her counseling sessions and when she began counseling sessions, providing that she began counseling around June 2023, rather than September. (Doc. No. 42-1 at ¶¶ 41, 42). The Court fails to see how what is in dispute is material to establish a "serious mental injury." By its very terms, the standard of summary judgment is that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

against Officer Pacheco, in relation to only the Second Search (part of Count 1b); and (3) Patterson's state-law claim of civil battery against Officer Pacheco (Count 4).

An appropriate corresponding order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE